# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | | |
|---|---|---|---|
| **MICHAEL S. PEKIN,** | ) | | |
| | ) | | **FILED: JUNE 26, 2008** |
| **Plaintiff,** | ) | | **08CV3644** |
| | ) | **No.** | **JUDGE KENNELLY** |
| **v.** | ) | | **MAGISTRATE JUDGE NOLAN** |
| | ) | | **AEE** |
| **UNUM GROUP,** | ) | | |
| | ) | | |
| **Defendant.** | ) | | |
| | ) | | |

## NOTICE OF REMOVAL OF CIVIL ACTION

**TO THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION:**

Defendant/removing party, UNUM GROUP ("Unum Group" or "defendant/removing party"), by its attorneys, Michael J. Smith and Warren von Schleicher, hereby provides notice of removal pursuant to 28 U.S.C. §1441, *et. seq.*, and respectfully presents this Court the following grounds for removal:

1.      Defendant/removing party is the defendant in an action captioned *Michael S. Pekin v. Unum Group*, No. 08 CH 17627 pending in the Circuit Court of Cook County, Illinois, County Department, Chancery Division.

2.      The aforementioned entitled action was commenced against the defendant/removing party in the Circuit Court of Cook County, Illinois, County Department, Chancery Division on May 14, 2008 and is still pending therein.

3.      On May 27, 2008, the Summons and Complaint in the aforesaid entitled action were served on the removing party *via* CT Corporation as the agent for service of process and such Summons and Complaint were forwarded to and received by the removing party on May 29, 2008.  A copy of the Summons and Complaint, with Exhibit A attached thereto, that were, in

fact, served on the defendant/removing party in the above entitled action are attached hereto as Exhibits A and B, respectively; this constitutes all of the process, pleadings and orders served on the defendant/removing party.

4.     Pursuant to 215 ILCS 5/112(2), service of process is not complete until a copy thereof has been mailed and received by the removing party.  The Summons and Complaint, therefore, were served on defendant/removing party, Unum Group, on May 29, 2008.

5.     Accordingly, defendant/removing party, Unum Group, is required to file its Notice of Removal on or before June 30, 2008 (30 days after service of the Complaint falls on Saturday, June 28, 2008 and, therefore, the last day for Unum Group to file its Notice of Removal is June 30, 2008).  Given that defendant/removing party, Unum Group, in fact, has filed its Notice of Removal on or before June 30, 2008, defendant's/removing party's Notice of Removal is presented and filed in a timely manner and in compliance with the provisions of 28 U.S.C. §1446(b).

6.     The above entitled action is a civil action related to a claim for residual disability insurance benefit payments that the plaintiff alleges he is entitled to receive pursuant to the terms and conditions of a disability insurance policy issued by The Paul Revere Life Insurance Company to the plaintiff.  In the section of the Complaint entitled "Facts Common to All Counts," plaintiff alleges, *inter alia*, that he purchased the Policy of individual disability insurance ("Policy") from "UNUM's predecessor," which Policy is attached as Exhibit A to the Complaint, and that the Policy provides for Residual Disability benefits to the plaintiff if he sustained a loss of earnings as a result of injury or illness, that plaintiff sustained a residual disability, that Unum Group paid residual disability benefits to him until March 2007, and that the amount of residual disability benefits paid to him on a monthly basis as of March 2007 was

approximately $10,000.00.  Further, in Count I of the Complaint entitled Declaratory Judgment of Insurance Coverage, plaintiff requests that the court declare that Unum Group has conceded the plaintiff's disability which precludes the plaintiff from performing the duties of his prior occupation as a trial lawyer and that the court declare that the plaintiff is entitled to residual disability benefits since March 2007, which is approximately $140,000.00.  In addition, in Count I, plaintiff requests that the court award plaintiff other and further relief that the court deems equitable and just.   In Count II of the Complaint entitled Specific Performance of Future Benefits, plaintiff requests that the court enter a decree of specific performance ordering Unum Group to continue to make residual disability benefit payments as they come due under the policy and award plaintiff his costs and such further relief that the court deems equitable and just.  In Count III of the Complaint entitled Breach of Contract, plaintiff requests that the court enter judgment against Unum Group and in the total amount of residual disability benefits denied to him since March 2007 and that he be awarded pre-judgment interest, costs and such further relief the court deems equitable and just.  In Count IV of the Complaint entitled Section 155 of the Illinois Insurance Code, plaintiff requests that the court enter judgment against Unum Group, award plaintiff his reasonable attorneys' fees and the maximum amount recoverable under §155 of the Illinois Insurance Code, 215 ILCS 5/155 (which is $60,000.00).   In Count V of the Complaint entitled Violation of Illinois Consumer Fraud and Deceptive Business Practices Act, plaintiff alleges that Unum Group has violated the Illinois Consumer Fraud and Deceptive Business Practices Act and requests that the court enter judgment against Unum Group and in favor of plaintiff for all actual damages, punitive damages, attorneys' fees and costs and such other and further relief that the court deems equitable and just.  Defendant/removing party contends, *inter alia*, that the plaintiff does not qualify for payment of any disability benefits

pursuant to the terms and conditions of the Policy and, therefore, is not entitled to the disability payments or any other damages that he claims he is entitled to receive from the defendant/removing party.  By reason of the statements made by plaintiff in his Complaint regarding the amount of residual disability payments made by Unum Group to the plaintiff when payments ceased in March 2007 and by reason of the foregoing requests for damages sought by plaintiff in Counts I, II, III, IV and V of the Complaint, the total amount of damages demanded, by the Complaint, at the time the Complaint was filed, exceeds the jurisdictional limit of $75,000.00 exclusive of interests and costs.

7.     Plaintiff, Michael S. Pekin, for purposes of diversity jurisdiction, is a citizen and resident of the State of Illinois; defendant/removing party, Unum Group, is a corporation duly organized and existing under and by virtue of the laws of the State of Delaware, with its principal place of business in Chattanooga, Tennessee and is, therefore, for purposes of diversity jurisdiction, a citizen and resident of the States of Delaware and Tennessee.  Diversity among the parties, therefore, exists.

8.     The above entitled action is a civil action related to a claim for residual disability benefits to which the plaintiff alleges he is entitled to receive and by which he seeks monthly payments of insurance benefits under the terms and conditions of the Policy. Defendant/removing party contends, *inter alia*, that plaintiff is not entitled to receive such monthly residual disability insurance benefits.  Because there is complete diversity among the parties to this matter and the amount in controversy exceeds $75,000.00, exclusive of interest and costs, defendant/removing party is entitled to removal of this matter from state court to federal court pursuant to 28 U.S.C. §1441, *et. seq.*

9.    This Court has original jurisdiction of the above entitled action pursuant to 28 U.S.C. §1332 and the action may, therefore, be removed to this Court pursuant to 28 U.S.C. §1441 and 28 U.S.C. §1446.

10.    Consistent with the holding in *Rubel v. Pfizer, Inc.*, 361 F.3d 1016, 1018 (7th Cir. 2004), it is the good faith belief of defendant/removing party that the amount in controversy exceeds the jurisdictional amount.

11.    This Notice of Removal is filed with this court within 30 days after service of the Summons and Complaint on defendant/removing party which occurred on or about May 29, 2008.

WHEREFORE, defendant/removing party, UNUM GROUP, requests that the above entitled action be removed from the Circuit Court of Cook County, Illinois, County Department, Chancery Division to this Court.

Dated this 26th day of June, 2008.

Respectfully submitted,

By: /s/ Michael J. Smith
Attorney for Defendant/Removing Party,
Unum Group

Michael J. Smith, ARDC #2649691
Warren von Schleicher, ARDC #6197189
Smith, von Schleicher & Associates
39 S. LaSalle St., Suite 1005
Chicago, Illinois  60603
(312) 541-0300
(312) 541-0933 Fax
michael.smith@svs-law.com
warren.vonschleicher@svs-law.com

# EXHIBIT A
# TO REMOVAL PETITION

| 2120 - Served | 2121 - Served | |
|---|---|---|
| 2220 - Not Served | 2221 - Not Served | |
| 2320 - Served By Mail | 2321 - Served By Mail | |
| 2420 - Served By Publication | 2421 - Served By Publication | |
| SUMMONS | ALIAS - SUMMONS | CCG N001-10M-1-07-05 ( ) |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, <u>CHANCERY</u> DIVISION

(Name all parties)

MICHAEL S. PEKIN

v.

UNUM GROUP

}

No. **08CH17627**

PLEASE SERVE:

UNUM GROUP
c/o CT Corporation, Registered Agent
208 S. LaSalle, Suite 814
Chicago, IL 60604

**SUMMONS**

To each Defendant:

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the Office of the Clerk of this Court at the following location:

☑ Richard J. Daley Center, 50 W. Washington, Room <u>802</u>, Chicago, Illinois 60602

☐ District 2 - Skokie
5600 Old Orchard Rd.
Skokie, IL 60077

☐ District 3 - Rolling Meadows
2121 Euclid
Rolling Meadows, IL 60008

☐ District 4 - Maywood
1500 Maybrook Ave.
Maywood, IL 60153

☐ District 5 - Bridgeview
10220 S. 76th Ave.
Bridgeview, IL 60455

☐ District 6 - Markham
16501 S. Kedzie Pkwy.
Markham, IL 60426

☐ Child Support
28 North Clark St., Room 200
Chicago, Illinois 60602

You must file within 30 days after service of this Summons, not counting the day of service.
IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.

To the officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than 30 days after its date.

Atty. No.: <u>32715</u>

Name: <u>William M. McErlean of Barnes & Thornburg LLP</u>

Atty. for: <u>Plaintiff</u>

Address: <u>One N. Wacker Drive, Suite 4400</u>

City/State/Zip: <u>Chicago, IL 60606</u>

Telephone: <u>(312) 357-1313</u>

Service by Facsimile Transmission will be accepted at: _____

WITNESS, **MAY 1 4 2008**

**DOROTHY BROWN**
**CLERK OF CIRCUIT COURT**
Clerk of Court

Date of service: _____,
(To be inserted by officer on copy left with defendant or other person)

(Area Code)   (Facsimile Telephone Number)

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

# EXHIBIT B
# TO REMOVAL PETITION

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| MICHAEL S. PEKIN, | ) | |
| | ) | |
| Plaintiff, | ) | **08CH17627** |
| | ) | |
| vs. | ) | Case No. |
| | ) | |
| UNUM GROUP | ) | **JURY DEMANDED ON** |
| | ) | **ALL LEGAL CLAIMS** |
| Defendants. | ) | |

**COMPLAINT FOR DECLARATION OF INSURANCE COVERAGE,
SPECIFIC PERFORMANCE, BREACH OF CONTRACT FOR BAD
FAITH DENIAL OF INSURANCE BENEFITS AND DAMAGES UNDER
SECTION 155 OF THE ILLINOIS INSURANCE CODE AND CONSUMER FRAUD**

Michael S. Pekin ("Pekin") by his attorneys, Barnes & Thornburg LLP, for his Complaint

for Declaration of Insurance Coverage, Specific Performance, Breach of Contract for Bad Faith

Denial of Insurance Benefits and for Damages Under Section 155 of the Illinois Insurance Code

and Consumer Fraud against the UNUM Group ("UNUM"), states and alleges as follows:

**STATEMENT OF THE CASE**

1.     Pekin was a trial attorney and a partner in the firm of Pekin, Leviff & Associates

when in 1993 he purchased from UNUM's predecessor a disability insurance policy ("Policy")

protecting Pekin and his family from any loss of earnings as a result of sickness or injury.  In

1999, as a result of LASIK surgery, Pekin suffered just such an injury and began suffering from

severe eye dryness, an ocular pain disorder creating constant eye pain and headaches, and

occlusion of his tear duct drainage system that made it difficult for Pekin to perform his duties as

a trial attorney, which required long periods of reading and intense concentration.  Informed by

physicians that his condition would improve, he took a leave of absence from his law firm to

give his eye injuries a chance to improve, and eventually took a position with a start-up

company, Oasis Legal Finance Group, LLC ("Oasis"), where his job duties did not require prolonged periods of reading and intense concentration. In March of 2004, Pekin realized that his eye injuries were not improving despite years of medical treatment and many different medications and that he would never be able to resume his occupation as a trial attorney. He applied to UNUM for disability insurance benefits under the Policy for which he had paid thousands of dollars in premiums over the years. UNUM conducted an investigation, reviewed Pekin's medical records, had him examined by their physicians and in 2004, UNUM concluded that Pekin was disabled and that his eye injuries prevented him from continuing in his chosen occupation and began paying him monthly benefits reflecting the difference between what he earned as a trial lawyer, indexed for inflation per the policy's provision, with what he earned in his position at Oasis. In early 2007, a new adjuster assigned to Pekin's file seized upon a change in Oasis' accounting method from a cash basis to an accrual basis, a change that Pekin had no control over and which did not benefit him in any way, to claim that the phantom income generated by Oasis in certain months under the accrual method made Pekin ineligible in certain months for his disability benefits. UNUM's position was unreasonable and in bad faith as UNUM knew such amounts of phantom income were not earnings received by Pekin under the Policy and that, in any event, UNUM was not allowed under the Policy to rely on the change in accounting methods, particularly when it also knew that under the cash method of accounting Oasis generated substantial losses. Even though Pekin, at his expense, provided cash method accounting which reflected losses for certain months challenged by UNUM, it persisted in its unreasonable position until late in 2007 when Oasis decided, in a decision that Pekin did not control, to return to a cash method of accounting and recast its 2007 results under that method which again produced nothing but losses. When those results were provided to UNUM, rather

2

than abandon its unreasonable position and restore Pekin's benefits, UNUM then focused on a sheer pretext to deny Pekin his benefits. Contrary to its original underwriting decision and even though nothing had changed in Pekin's medical condition, UNUM decided that no further benefits would be paid Pekin because at the time he filed his claim with UNUM he was employed by Oasis and there was no loss in earnings from his eye injuries during his employment at Oasis, because arbitrarily and without basis and contrary to UNUM's original underwriting decision, UNUM was going to use the date Pekin filed his claim for benefits as the date his disability began even though UNUM knew that was not true and contrary to the Policy. In short, Pekin, who paid for disability insurance to protect him and his family in the event an injury prevented him from continuing in his occupation as a trial attorney, is now being denied those benefits for which he paid, as a result of UNUM's arbitrary, capricious and bad faith search for any pretextual basis to deny Pekin his benefits, even though UNUM acknowledges Pekin cannot continue in his occupation as a trial attorney.

## PARTIES

2.    Pekin is a resident of Lake County, Illinois and the father of three minor children, who with his wife is raising his family in Lake County.

3.    UNUM is a life insurance company incorporated under the laws of Delaware with its principal place of business located in Tennessee that routinely and regularly transacts business in Cook County.

4.    Pekin purchased his disability insurance policy in 1993 from the Paul Revere Life Insurance company which in 2001 was merged into UNUM, which is the successor in interest to the Paul Revere Life Insurance Company and UNUM is responsible for all obligations of the insurer under the Policy.

3

## JURISDICTION AND VENUE

5.    This Court has jurisdiction over UNUM in that Pekin's causes of action arise from the UNUM's transaction of business in this State and by contracting with Pekin to provide to him disability insurance benefits here in Illinois pursuant to 735 ILCS 5-2-209 (a) (1), (4) and (7).

6.    Venue is proper in the Circuit Court of Cook County as Pekin's disability insurance contract was made in Cook County and Cook County is where the transaction or some part thereof occurred out of which Pekin's causes of action arises.

## FACTS COMMON TO ALL COUNTS

### A.  The Policy.

7.    Pekin, upon graduation from law school and being admitted to practice law in the State of Illinois, began practicing law full-time as a trial lawyer at Pekin, Levin & Associates ("Pekin Levin") in 1988.  Pekin became a partner in Pekin Levin on June 21, 1989.

8.    On or about October 28, 1993, Pekin, in order to protect himself and his young family from a disruption and loss in his income as a trial lawyer in the event any injury or illness prevented him from practicing full-time as a trial lawyer, purchased here in Cook County from UNUM's predecessor an individual disability insurance policy, Policy No. 0102634929.  A true and correct copy of the policy is attached hereto as Exhibit A (the "Policy").

9.    Pekin regularly paid thousands of dollars in premiums to UNUM to keep the Policy in effect with the hope that he would never have to use the disability insurance benefits he had purchased.

10.    The Policy provides for "Residual Disability" benefits to Pekin if he suffered a Loss of Earnings as a result of an injury or an illness that prevented him from performing fully

4

all of his important duties as a trial lawyer, but such injury or illness did not preclude him from all employment as would a total disability.

11.    Under the Policy, in the event Pekin incurred a Residual Disability, UNUM promised to pay him a Residual Disability Benefit in a monthly amount calculated as Pekin's Loss of Earnings divided by Prior Earnings multiplied by the maximum monthly amount stipulated by the Policy.

12.    The Policy defines Prior Earnings as the greater of the average of either Pekin's average monthly earnings for the year just prior to the beginning of a disability or the highest average monthly earnings for any two successive years during the five-year period before the disability began.

13.    The Policy defines Loss of Earnings as Pekin's Prior Earnings, less his actual Monthly Earnings for the month in which a benefit is claimed.

14.    In determining Monthly Earnings for calculation of the Residual Disability Benefit, the Policy defines Monthly Earnings to include "salary, wages, commissions, bonuses, fees, and income earned for services performed." If the insured owns an interest in a business, Monthly Earnings included the insured's share of income earned by that business less the insured's share of deductible business expenses plus salary and any contributions to a pension or profit sharing plan. This definition of Monthly Earnings was intended to capture direct or indirect earnings that an insured received as an owner of a small business in order to capture payments that might be paid by such business for the insured's financial benefit. This definition of Monthly Earnings was not intended to sweep into Monthly Earnings phantom income booked by the insured's employer for financial reporting purposes when the insured owned only a small

minority interest in the employer and received no payments of, or benefit from, phantom book income that was not distributed in any way to the insured.

15.     In determining Monthly Earnings from an insured's ownership interest in a business, UNUM was required to allow either the cash or accrual accounting method, but also was required to use the same method in determining a Loss of Earnings during the period of disability.

## B. Pekin Suffers a Disability and Receives Disability Benefits to Which He Was Entitled.

16.     Pekin, through his efforts and hard work as a trial lawyer at Pekin Levin, was successful and he was able to enjoy a handsome income as his firm prospered.

17.     In 1999, Pekin underwent LASIK surgery and, in the aftermath of the surgery, suffered nerve damage to his eyes, halos, severe dryness, severe ocular pain disorder and occlusion of his tear duct drainage system. The pain and other symptoms experienced by Pekin were exacerbated by intense and prolonged periods of intense concentration and prolonged reading, which are regularly required of trial lawyers in performing their occupation.

18.     After the surgery, Pekin began receiving regular medical treatments to mitigate the pain and other symptoms he was experiencing as a result of the injury to his eyes, and while he was advised by his physicians that he would experience improvement as a result of the various treatments he received, he did not, and he struggled to perform his required duties as a partner at Pekin Levin and to deal with the pain and discomfort he was experiencing when attempting to perform his duties at the firm.

19.     By the end of 2002, as Pekin's pain and discomfort continued unabated and he found himself unable to perform all of his duties as a trial lawyer at Pekin Levin, Pekin took a

six-month leave of absence to allow his eye injuries to heal, which he was hopeful would result from rest and absence from the demands of his practice.

20.    During his leave of absence, Oasis, a start-up legal financing company, offered Pekin employment and a small minority ownership interest. Unlike his practice at Pekin Levin, the position at Oasis did not require long periods of reading or intense concentration that his position as a trial attorney did, so he accepted the position and began work at Oasis and found that his eye injuries did not prevent him from performing all of his job duties at Oasis and his position did not exacerbate his pain and discomfort as did his occupation as a trial attorney.

21.    As a result of his employment at Oasis and Pekin's hope that the reduced rigor of required reading during long hours of intense concentration would help heal his eye injuries, Pekin elected not to return to Pekin Levin and entered into an agreement to terminate his interest in the partnership, which agreement was consummated in December of 2003.

22.    In March of 2004, Oasis' business was struggling and Pekin faced the prospect of having to find other employment and the need to return to his profession as a trial lawyer. Up until this time, Pekin believed that the passage of time and the many medications he was prescribed would improve his condition and allow him to resume his chose profession. However, by March of 2004, Pekin determined that his eye injuries were not going to improve and that he would be unable to ever return to his occupation as a trial lawyer, and as a result Pekin made a claim with UNUM for his Residual Disability benefits under the Policy in March of 2004, and completed all required claims forms by April of 2004, and relied upon UNUM to act in good faith and provide coverage under the Policy.

23.    UNUM launched an extensive investigation of Pekin's claim including a review of all of his medical records, interviews with Pekin and others, and requiring Pekin to be

7

examined by a physician selected by UNUM after which investigation UNUM concluded that, in fact, Pekin had a Residual Disability and was unable to perform all of the important duties of Pekin's occupation as a trial attorney.

24.    By late 2004, UNUM, as a result of its extensive investigation and underwriting process, and determination that because Pekin was unable to perform all of his important duties as a trial attorney because of his eye injuries, began to pay Pekin a Monthly Residual Disability Benefit that consisted of the difference between his Prior Earnings as a trial attorney as determined under the Policy and his Monthly Earnings at Oasis. Pekin relied upon UNUM's good faith interpretation of the Policy as exhibited in its underwriting decision and coverage decision.

## C. UNUM In Bad Faith Unreasonably Denies Pekin His Insurance Benefits.

25.    UNUM paid a monthly disability benefit to Pekin, upon which he and his family relied, until March of 2007, at which time the monthly benefit was approximately $10,000 a month. While UNUM at that time ceased paying further monthly benefits, wrongfully claiming that Pekin was ineligible for benefits, the amount of the benefit was increased by UNUM to $11,000 in November of 2007. UNUM required Pekin to submit regular financial statements of Oasis, which from inception of its operations used a cash method of accounting, and because Oasis was a start-up company those statements reflected regular losses each month from inception, a fact well known to UNUM. Pekin indirectly owned a small minority interest in Oasis and had no control or say over the accounting methods of Oasis. For 2007, Oasis decided to employ an accrual basis of accounting to present itself in a better posture for possible acquisitions and to reflect its future business prospects in a better light. On an accrual basis, Oasis in certain months in the first half of 2007 showed positive net income, although given the

company's large accumulated losses, Pekin as an indirect minority owner received no distribution or earnings from any such phantom income.

26.    However, in March of 2007, UNUM, through a new adjuster reviewing Pekin's file, in bad faith and contrary to the express provisions of the Policy which required UNUM to use the same accounting method to determine Pekin's Residual Disability Benefits, used the accounting change as a pretext to deny Pekin certain of his monthly benefits even though UNUM knew Pekin received absolutely no income or earnings or other benefits from Oasis' phantom income during these months and even though UNUM knew that only losses would have been generated under the cash method of accounting used by Oasis since inception.

27.    In April of 2007, Pekin had Oasis' Director of Finance explain to the UNUM adjuster that Oasis' change in accounting method to an accrual basis and the recapitalization of Oasis created additional deferred revenues that had absolutely no impact on Oasis' negative cash flow and that Pekin received absolutely no benefit of any kind from the deferred revenues and that the only earnings or income received by Pekin from Oasis was his salary and eligibility for a bonus.

28.    From April of 2007 through September of 2007, Pekin provided additional Oasis and personal financial documentation requested by UNUM including an estimate by Oasis' Director of Finance in May of 2007 of the losses that would have been incurred under the cash method of accounting, but UNUM refused to alter its position that the phantom income generated by the accrual method of accounting created income for Pekin that precluded him from receiving his benefits, and by letter of October 10, 2007 to Pekin from UNUM's adjuster, a true and correct copy of which is attached hereto as Exhibit B, affirmed UNUM's denial of coverage and demanded payment from Pekin of an alleged overpayment of $13,946.40.

9

29.    Demonstrating UNUM's bad faith, the October 10, 2007 letter contained two misrepresentations.  First, UNUM's adjuster falsely contended that Oasis' Director of Finance, during a September 6, 2007 conference call, stated that the accrual method was a more accurate reflection of Oasis' income and that Pekin agreed that UNUM could use the accrual method in determining his disability benefits.  Both of these inaccuracies were pointed out in Pekin's counsel's letter to UNUM of October 16, 2007, a true and correct copy of which is attached hereto as Exhibit C.

30.    UNUM responded by letter of October 19, 2007, a true and correct copy of which is attached hereto as Exhibit D, which continued UNUM's unreasonable and vexatious conduct by falsely suggesting that it was Pekin, not UNUM, that initiated the process by which his benefits were denied when in fact Pekin requested that UNUM reverse its decision denying coverage because he received no income or any benefit from the change in accounting method. In the letter, UNUM acknowledged that the Policy required UNUM to use the cash method of accounting, which UNUM knew produced only losses, but UNUM decided that it would use the accrual method statements as that was the only information that it had been provided.  This statement was false because prior to this letter and UNUM's letter of October 10, 2007, UNUM had been supplied by Pekin, at his expense, Oasis' financial information prepared on a cash basis method for the months of April and May of 2007, which information UNUM simply chose to ignore even though UNUM stated in the October 19th letter that "If Mr. Pekin desires to provide us with cash basis profit/loss statements, we will be happy to review them to see if it results in a different amount of monthly earnings." This also proved to be false as UNUM was not "happy" to review any cash basis statements, but in fact had to search for another pretextual basis for

10

denying Pekin his benefits when Oasis decided to change back to a cash basis and recast all of its 2007 results.

31.     In fact, the letter of October 19, 2007 foreshadowed the bad faith pretext that UNUM would later seize upon to deny Pekin his benefits.  In the letter the UNUM adjuster stated "It is unclear at this time how much of the losses experienced by Mr. Pekin are due solely to his injury/sickness versus how much loss may be due to business trends."

32.     By letter of October 29, 2007 to UNUM from Pekin's counsel, a true and correct copy of which is attached hereto as Exhibit E, Pekin's counsel pointed out the falsehoods and inaccuracies in UNUM's October 19th letter, and the fact that UNUM had already received cash basis statements from Pekin and put UNUM on notice that it was acting in bad faith.

33.     UNUM responded to Pekin's counsel by letter of November 14, 2007, in which UNUM denied it was acting in bad faith and the adjuster stated that he was "personally offended" by the accusations.  Despite the personal offense, the adjuster in his letter admitted that as a result of UNUM's investigation in 2004, UNUM concluded that Pekin's eye injuries in fact precluded him from continuing in his occupation as a trial attorney and that in determining that Pekin was entitled to Residual Disability Benefits used his earnings from the years ending June 30, 2001 and June 30, 2002 when Pekin was practicing law and that Oasis from 2004 through 2006 sustained large losses before changing accounting methods.  The adjuster also acknowledged receipt of cash basis statements from Pekin for certain months, but refused to revise UNUM's calculations using that information.  The adjuster further intimated the bad faith direction UNUM was going, describing the "challenges" UNUM was having in determining how much of Pekin's loss of earnings was due to his acknowledged injury because of complications in measuring his loss of income "against two different sources/occupations."

34.    Pekin's counsel by letter of November 20, 2007, a true and correct copy of which is attached hereto as Exhibit F, again warned UNUM that its denial of Mr. Pekin's disability benefits was unreasonable and vexatious by using Oasis' change of accounting method to justify depriving Pekin of his benefits:

> "Let me make our position clear. Your claim that you can only use the financial reporting provided by Mr. Pekin's employer and use that to justify your denial of benefits is meritless. The policy contemplates including in a determination of Loss of Earnings any earnings that Mr. Pekin received and pays taxes on from whatever source. It does not contemplate inclusion of phantom income generated by a change in an accounting method from which Mr. Pekin receives absolutely no benefit. In point of fact, it appears that you, on behalf of UNUM, were simply searching for a basis to justify denying Mr. Pekin his benefits. This is bad faith.

UNUM was also alerted that Oasis had just decided to return to the cash basis of accounting and would be restating its 2007 results under this method. Pekin's counsel promised to send the information to UNUM at which time reinstatement of all of Pekin's benefits wrongfully withheld was expected as "UNUM will have no justification, pretextual or otherwise for withholding Mr. Pekin's benefits."

35.    The letter of November 20, 2007 also warned UNUM against taking the unreasonable coverage position it seemed to be reaching for:

> "For example, in your November 14, 2007 letter you repeatedly insinuate that because UNUM unilaterally and without any basis decided that Mr. Pekin's disability began on March 10, 2004, and he was in his current position at Oasis at that time, UNUM is encountering 'challenges' in determining how Mr. Pekin's loss of income is due to his medical condition as opposed to other factors such as his losses from his occupation as a trial attorney versus his losses as Executive Vice President of Oasis through Oasis' substantial losses through the years. By this I take it UNUM is searching for another alternative ground to try to deny Mr. Pekin the benefits to which he is entitled. This also is bad faith. Mr. Pekin's disability began when his vision problems began. He was advised that the vision problems would get better so he took a

leave of absence from his position as a trial lawyer to give his problems time to get better. Of course, he did not think he was disabled at that time because he thought his problems would improve. They did not and by March of 2004, he realized that he never would be able to resume his career as a trial lawyer, which was more lucrative than his current career. Mr. Pekin bought disability insurance in the event he was disabled and could not continue his career as a trial attorney. That is what happened and this was all ground that was covered in 2004 when Mr. Pekin first made his claim for benefits. Your seeming attempt to revise the original decision and create possible "challenges" where none exist, as they did not in 2004 when the initial determination was made, is groundless.

36.    Despite being warned of the unreasonable coverage position that UNUM appeared to be moving towards, it persisted in moving in that direction because Oasis' decision to return to a cash basis method of accounting was eliminating the unreasonable pretext that UNUM had seized upon to deny Mr. Pekin his benefits, as set forth in UNUM's adjuster's letter of November 29, 2007, a true and correct copy of which is attached hereto as Exhibit G, in which UNUM, in another example of bad faith, raised a claim of a potential conflict of interest against Pekin's counsel arising from Pekin's counsel's law firm's prior representation of Paul Revere Life Insurance Company in unrelated and completed matters.

37.    By letter of January 22, 2008, a true and correct copy of which is attached hereto as Exhibit H, Pekin's counsel transmitted to UNUM Oasis' restated 2007 results under the cash method of accounting and demanded reinstatement of the payments of his benefits.

38.    With the pretext of a change in accounting method by Oasis eliminated as justification for UNUM's wrongful denial of Pekin's benefits, UNUM then in bad faith took the unreasonable and arbitrary position that it had been moving to over the last few months and that it had been warned would be an act of bad faith if UNUM decided to take that position. By letter of January 31, 2008 to Pekin's counsel, a true and correct copy of which is attached hereto as

Exhibit I, UNUM while admitting that its clinical and vocational consultants had recently reviewed the file and concluded that Pekin's eye injuries did preclude his continued occupation as a trial attorney, they reached the obvious conclusion that Pekin's eye injuries did not impact his ability to perform his duties at Oasis. Therefore, UNUM concluded in utter bad faith, and contrary to its original underwriting decision, that since Pekin was employed by Oasis at the time of the claim, which UNUM arbitrarily decided was also the date of his loss and disability, his eye injuries had no connection to any loss of earnings he may have had while at Oasis.

39.    Thus, UNUM concluded a nearly year-long campaign of bad faith designed only to wrongfully deprive Pekin of his benefits, which UNUM had determined in 2004 that he was owed. First, by arbitrarily seizing upon a change of accounting methods by Oasis that UNUM was not permitted under the Policy to use to deprive Pekin of his benefits, UNUM stopped paying Pekin his benefits. Then, UNUM developed a backup coverage position during 2007 in the event that it was deprived of its pretextual use of Oasis' change in accounting methods. Despite being warned that such a coverage position was unreasonable and in bad faith and contrary to UNUM's 2004 coverage position, UNUM determined not to pay Pekin's insurance payments under any circumstances by settling on its transparently ridiculous and malicious coverage position that Pekin's eye injuries were not the cause of any loss of earnings at Oasis. Of course not, as Pekin's earnings have steadily risen at Oasis, but they are still substantially behind his earnings as a trial lawyer which is the measure of his benefits as UNUM correctly determined in 2004. Pekin purchased disability insurance to protect his family if he incurred an injury or illness that precluded him from his occupation as a trial lawyer. Unfortunately, he suffered just such an injury and had to leave his chosen profession as a result. He has and

continues to suffer a Loss of Earnings and he is entitled to the Residual Disability Benefits for which he contracted.

## COUNT I

## DECLARATORY JUDGMENT OF INSURANCE COVERAGE

40.    Pekin realleges and incorporates paragraphs 1 through 39 inclusive of this Complaint as paragraph 40.

41.    There exists actual controversy between Pekin and UNUM whether there exists coverage under the Policy for Residual Disability Benefits pursuant to 735 ILCS 5/2-701, and a declaration of the parties' rights under the Policy would terminate a substantial portion of the controversy between Pekin and UNUM.

42.    UNUM in material breach of the Policy by denying coverage and taking the position that Pekin's disability first arose at the time he filed the claim and by contending that Mr. Pekin's disability therefore did not cause any Loss of Earnings at his occupation at Oasis in comparing his earnings at Oasis before and after filing of the claim.

43.    UNUM's material breach and coverage position is a blatant bad faith attempt to avoid UNUM's obligation to continue to pay Pekin's Residual Disability Benefits under the Policy as UNUM knows that, in fact, Pekin is disabled and his disability precludes him from fulfilling his duties in the occupation of trial lawyer which was Pekin's occupation at the time he purchased the Policy and when his disability first arose.

44.    Pekin has performed all that he is required to perform under the Policy.

WHEREFORE, Michael S. Pekin prays that the Court enter a judgment declaring the parties' rights under the Policy as follows:

A.  That UNUM's coverage position and denial of Pekin's Residual Disability Benefits is in violation of the Policy and not supported by the language of the Policy;

B.  That UNUM has conceded Pekin's disability and that it precludes Pekin from performing the duties of his prior occupation as a trial lawyer and therefore, Pekin is entitled to Residual Disability Benefits from March of 2007 when UNUM wrongfully stopped paying his benefits;

C.  That UNUM is estopped from changing its original underwriting and coverage decision in 2004 extending coverage to Pekin when no facts have changed since that original decision; and

D.  Award such further relief the Court deems equitable and just.

## COUNT II

### SPECIFIC PERFORMANCE OF FUTURE BENEFITS

45.  Pekin realleges and incorporates paragraphs 1 through 39 inclusive of this Complaint as paragraph 45.

46.  UNUM's denial of Residual Disability Benefits by its unreasonable and bad faith coverage position is a material breach of the Policy and UNUM's duty of good faith and fair dealing.

47.  Pekin has performed all obligations he has under the Policy.

48.  As a direct and foreseeable result of UNUM's breach of the Policy, Pekin has been injured and has no adequate remedy at law for his future Residual Disability Benefits that will come due in the future after this litigation is concluded, unless UNUM is ordered to

specifically perform under the Policy and pay to Pekin all future monthly Residual Disability Benefits that are allowed under the Policy.

WHEREFORE, Michael S. Pekin prays that this Court enter a decree of specific performance ordering UNUM Group to continue to make Residual Disability Benefits as they come due in the future under the Policy and award him his costs and such further relief the Court deems equitable and just.

## COUNT III

### BREACH OF CONTRACT

49.    Pekin realleges and incorporates by reference paragraphs 1 through 39, and 46 through 48 inclusive of this Complaint as paragraph 49.

50.    As a direct and foreseeable result of UNUM's bad faith and material breach of the Policy, Pekin has been damaged by the wrongful denial of his monthly Residual Disability Benefits since March of 2007.

51.    The amount of the Residual Disability Benefits is a definite and liquidated sum to be calculated under the Policy.

WHEREFORE, Michael S. Pekin prays that judgment be awarded against UNUM Group in the total amount of the monthly Residual Disability Benefits denied to him since March of 2007 and that he be awarded pre-judgment interest and his costs and such further relief the Court deems equitable and just.

## COUNT IV

### SECTION 155 OF THE ILLINOIS INSURANCE CODE

52.    Pekin realleges and incorporates by reference paragraphs 1 through 39 inclusive of this Complaint as paragraph 52.

17

53.   UNUM's conduct alleged herein was a blatant attempt by an insurer to create justifications, where none existed, to deny Pekin continued payment of his Residual Disability Benefits in violation of the Policy and its obligation of good faith and fair dealing.

54.   UNUM's conduct alleged herein was vexatious and unreasonable and entitles Pekin to the relief set forth in 215 ILCS 4/155.

WHEREFORE, Michael S. Pekin prays that the Court, in addition to the relief requested herein, enter judgment against the UNUM Group and award him his reasonable attorneys' fees, costs and the maximum amount recoverable under Section 155 of the Illinois Insurance Code, 215 ILCS 5/155.

## COUNT V

### VIOLATION OF ILLINOIS CONSUMER
### FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT

55.   Pekin realleges and incorporates paragraphs 1 through 39 inclusive of this Complaint as paragraph 55.

56.   This claim arises under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* (the "Act").

57.   Pekin is a consumer as defined under the Act who purchased the Policy not for resale, but for his own personal use to protect him and his family from any injury or sickness that caused him a Loss of Earnings.

58.   The Policy was merchandise as defined under the Act.

59.   UNUM violated the act by engaging *inter alia* in the following deceptive acts or practices with the intent that Pekin rely on UNUM's deceptive acts and simply acquiesce in UNUM's intentional and wrongful decision to create a pretextual basis for denying Pekin coverage and ending his benefits:

18

a.      falsely claiming that Oasis' change of accounting method allowed UNUM to seize on that change and deny coverage under the Policy;

b.      misrepresenting purported statements by Oasis and positions asserted by Pekin in its letter of October 19, 2007;

c.      falsely claiming that it had not received any cash basis statements from Pekin that it had requested;

d.      ignoring, as was UNUM's intent, the cash basis statements supplied to them by Pekin which UNUM had requested as it searched for an alternative pretextual basis on which to deny coverage;

e.      falsely claiming an alleged conflict of interest to try to deprive Pekin of his selected counsel; and

f.      repudiating its 2004 underwriting and coverage positions and asserting the false position not supported by the Policy that Pekin's acknowledged eye injuries had not caused any Loss of Earnings at Oasis when in fact they had caused Loss of Earnings from his career as a trial attorney, which UNUM knew, as exhibited by its 2004 underwriting and coverage decisions, was, in fact, covered by the Policy and the very reason Pekin purchased the Policy.

60.      UNUM engaged in these deceptive acts and practices with actual knowledge of the false and deceptive nature of the representations and assertions it was making, as evidenced by its repudiation of its original 2004 coverage decision, and by UNUM continuing to engage in these deceptive acts even after being notified by Pekin's counsel's letters of its deceptive practices.

61.    Pekin has suffered actual damages as a result of UNUM's violation of the Act and pursuant to Section 10(a) of this Act brings this claim against UNUM for the wrongful denial of his Residual Disability Benefits.

62.    UNUM's violation of the Act was committed intentionally and deliberately with the intent to injure Pekin and wrongfully deny him his Residual Disability Benefits entitling Pekin to punitive damages to deter UNUM from such outrageous and intentional misconduct.

WHEREFORE, Michael S. Pekin prays that judgment be entered in his favor and against UNUM Group for all of his actual damages to be proved at trial, punitive damages, his attorneys' fees and costs, and such other and further relief the Court deems equitable and just.


MICHAEL S. PEKIN


By: _____
One of His Attorneys


William M. McErlean
Amy L. D'Addario
BARNES & THORNBURG LLP
One N. Wacker Drive, Suite 4400
Chicago, IL 60606
(312) 357-1313
Firm ID No.: 32715


CHDS01 WMCERLEAN 461338v1

A



# THE PAUL REVERE
## LIFE INSURANCE COMPANY

**18 CHESTNUT STREET**
**WORCESTER, MASSACHUSETTS 01608**

The Paul Revere Life Insurance Company will pay the benefits provided in this Policy for loss due to Injury or Sickness.

We have issued this Policy to You in consideration of the payment of the premium and the statements made in Your application. Your application is part of this Policy.

**Insured**      MICHAEL S PEKIN

**Policy Number**    01026349290          OCT 28, 1993       **Date of Issue**

**NON-CANCELLABLE AND GUARANTEED CONTINUABLE TO AGE 65. NO CHANGE IN PREMIUM RATES.** As long as the premium is paid on time, We cannot change Your Policy or its premium rate until Your 65th birthday.

**RENEWAL OPTIONS AFTER YOU REACH AGE 65. SUBJECT TO CHANGE IN PREMIUM RATES.** You may continue Your Policy for a Total Disability benefit with a limited benefit period while You are actively and regularly employed full time. There is no age limit. This option is explained in PART 7.

When You are no longer actively and regularly employed after age 65, You may continue Your Policy for the rest of Your life. The benefit will be limited to a Hospital Confinement Indemnity. This benefit will take the place of all other benefits under the Policy. This option is explained in PART 8.

**YOUR RIGHT TO CANCEL.** If You are not satisfied with Your Policy, You may cancel it. Return the Policy to Us or Our agent by midnight of the tenth day after the date You receive it. If You return the Policy by mail, it must be properly addressed, postage prepaid, and postmarked no later than midnight of that tenth day. Our mailing address is 18 Chestnut Street, Worcester, Massachusetts 01608. Within ten days after We receive the Policy, We will refund any premium You have paid. The Policy will be considered to have never been issued.

**READ YOUR POLICY CAREFULLY.** It is a legal contract between You and Us.

Signed for The Paul Revere Life Insurance Company.

*John N. Budd*
Secretary

*Charles E. Soule*
President

CHARTERED IN MASSACHUSETTS

990 IL                    DISABILITY INCOME POLICY                    91-1

## TABLE OF CONTENTS

| | Page |
|---|---|
| Renewal Provisions | 1 |
| Policy Schedule | 3 |
| Automatic Increase Benefit | 3 |
| Part 1 — Definitions | 6 |
| Part 2 — Benefits | 8 |
|     Total Disability Benefit | |
|     Residual Disability Benefit | |
|     Recovery Benefit | |
|     Presumptive Total Disability Benefit | |
|     Cosmetic or Transplant Surgery | |
|     Rehabilitation | |
|     Survivor Benefit | |
| Part 3 — Exclusions | 11 |
| Part 4 — Premium and Reinstatement | 12 |
| Part 5 — Waiver of Premium | 13 |
| Part 6 — Recurrent and Concurrent Disability | 13 |
| Part 7 — Renewal Option After Age 65 | 14 |
|     If Employed - Total Disability Benefit | |
| Part 8 — Renewal Option After Age 65 | 15 |
|     If Not Employed - Hospital Confinement Indemnity | |
| Part 9 — Claims | 16 |
| Part 10 — General Provisions | 17 |

A copy of Your application, added benefits You have purchased, and any added provisions are attached at the back of the Policy.

POLICY SCHEDULE

POLICY NUMBER:  0102634929                 DATE OF ISSUE:  OCT 28, 1993

INSURED:       MICHAEL S PEKIN

POLICY OWNER:  THE INSURED

**************************************************************************

SUMMARY OF PREMIUM  PREFERRED NONSMOKER

| | |
|---|---|
| ANNUAL PREMIUM FOR DISABILITY BENEFITS | $1,363.00 |
| ANNUAL PREMIUM FOR ADDITIONAL BENEFITS | $160.20 |
| TOTAL ANNUAL PREMIUM | $1,523.20 |
| *SELECT 15 ANNUAL PREMIUM | $1,294.72 |
| YOUR SEMIANNUAL PREMIUM EMPLOYEE SECURITY PLAN | $673.25 |

*YOU HAVE A SELECT PREMIUM AS INDICATED.
THIS PREMIUM WILL REMAIN IN EFFECT UNTIL YOUR 65TH BIRTHDAY.  IT IS
SUBJECT TO CHANGE IF YOU RENEW YOUR POLICY AFTER YOUR 65TH BIRTHDAY.

**************************************************************************

TABLE OF DISABILITY BENEFITS

| FROM INJURY OR FROM SICKNESS | COMMENCEMENT DATE | MAXIMUM MONTHLY AMOUNT | MAXIMUM BENEFIT PERIOD* |
|---|---|---|---|
| | 91ST DAY | $5,000.00 | TO AGE 65 |

QUALIFICATION PERIOD FOR RESIDUAL DISABILITY:    0 DAYS
*THE MAXIMUM BENEFIT PERIOD MAY CHANGE DUE TO YOUR AGE AT TOTAL DISABILITY.
PLEASE SEE POLICY SCHEDULE II.
**************************************************************************

MODIFICATION OF COVERAGE

NONE.

**************************************************************************

PREFERRED PROFESSIONAL DISABILITY INCOME POLICY        91-1

## POLICY SCHEDULE

POLICY NUMBER:  0102634929

DATE OF ISSUE:  OCT 28, 1993

INSURED:     MICHAEL S PEKIN

POLICY OWNER:  THE INSURED

************************************************************************

### TABLE OF ADDITIONAL BENEFITS

| ADDITIONAL BENEFITS ATTACHED | AMOUNT OF BENEFIT | MAXIMUM BENEFIT PERIOD | ANNUAL PREMIUM PRIOR TO AGE 65 |
|---|---|---|---|
| FUTURE INCOME OPTION UNIT OF INCREASE: MAXIMUM # OF UNITS: EXPIRATION DATE: (875) | $1,000.00 10 UNITS OCT 28, 2011 | -- | $74.20 |
| TOTAL DISABILITY IN YOUR OCCUPATION | -- | -- | $86.00 |

POLICY SCHEDULE II

POLICY NUMBER:  0102634929                DATE OF ISSUE:  OCT 28, 1993

INSURED:        MICHAEL S PEKIN

POLICY OWNER:   THE INSURED

**************************************************************************

MAXIMUM BENEFIT PERIODS

FOR TOTAL DISABILITY BENEFITS PAYABLE TO AGE 65, IF TOTAL DISABILITY BEGINS:

| | |
|---|---|
| BEFORE AGE 61 | TO AGE 65 |
| AT AGE 61 BUT BEFORE AGE 62 | 48 MONTHS |
| AT AGE 62 BUT BEFORE AGE 63 | 42 MONTHS |
| AT AGE 63 BUT BEFORE AGE 64 | 36 MONTHS |
| AT AGE 64 BUT BEFORE AGE 65 | 30 MONTHS |
| AT OR AFTER AGE 65 BUT BEFORE AGE 75 | 24 MONTHS |
| AT OR AFTER AGE 75 | 12 MONTHS |

POLICY SCHEDULE III

POLICY NUMBER:   0102634929                 DATE OF ISSUE:  OCT 28, 1993

INSURED:        MICHAEL S PEKIN

POLICY OWNER:   THE INSURED

**********************************************************************

AUTOMATIC INCREASES

$250 WILL BE AUTOMATICALLY ADDED TO YOUR MONTHLY TOTAL DISABILITY BENEFIT WITHOUT EVIDENCE OF INSURABILITY.  THIS WILL BE DONE ON EACH INCREASE DATE.

THESE INCREASES ARE SUBJECT TO THE TIMELY PAYMENT OF THE PROPER PREMIUM. THESE PREMIUMS ARE BASED UPON YOUR ATTAINED AGE ON THE INCREASE DATE.  THEY ARE LISTED BELOW.

| INCREASE DATE | MONTHLY BENEFIT INCREASE | ANNUAL PREMIUM INCREASE |
|---|---|---|
| OCT 28, 1994 | $250.00 | $59.31 |
| OCT 28, 1995 | $250.00 | $61.91 |
| OCT 28, 1996 | $250.00 | $64.52 |
| OCT 28, 1997 | $250.00 | $67.15 |
| OCT 28, 1998 | $250.00 | $71.07 |
| TOTAL INCREASE | $1,250.00 | $323.96 |

A BENEFIT INCREASE WILL APPLY ONLY TO A DISABILITY WHICH STARTS AFTER THE INCREASE DATE.  IT WILL NOT APPLY TO A CONTINUATION OF A PRIOR DISABILITY. SEE THE RECURRENT DISABILITY SECTION OF THIS POLICY.  IF THE PREMIUM FOR THE POLICY IS BEING WAIVED (SEE WAIVER OF PREMIUM SECTION) ON THE INCREASE DATE, THE PREMIUM FOR THE INCREASE WILL ALSO BE WAIVED.  WHEN YOU RESUME PAYING PREMIUMS FOR THE POLICY, YOU MUST ALSO START PAYING THE PREMIUM FOR THE INCREASE.

YOU MAY REFUSE AN INCREASE BY NOTIFYING US IN WRITING 30 DAYS PRIOR TO THE INCREASE DATE.  YOUR REFUSAL OF AN INCREASE WILL NOT AFFECT THE REMAINING AUTOMATIC INCREASES.  HOWEVER, IF YOU REFUSE THE FIRST TWO CONSECUTIVE INCREASES ALL FURTHER INCREASES WILL BE CANCELLED.

PRIOR TO YOUR 60TH BIRTHDAY, YOU MAY APPLY FOR ADDITIONAL AUTOMATIC INCREASES.  YOU CAN DO THIS BY MAKING FORMAL APPLICATION WITHIN THE PERIOD OF 60 DAYS PRIOR TO AND 31 DAYS AFTER THE LAST INCREASE DATE SHOWN ABOVE. APPROVAL WILL BE SUBJECT TO OUR UNDERWRITING GUIDELINES.

# PART 1
## DEFINITIONS

THE FOLLOWING WORDS HAVE SPECIAL MEANINGS. THEY ARE IMPORTANT IN DESCRIBING YOUR RIGHTS AND OUR RIGHTS UNDER THE POLICY. REFER BACK TO THESE MEANINGS AS YOU READ YOUR POLICY.

1.1 **"Policy"** means the legal contract between You and Us. The policy, the application, the Policy Schedule, and any attached papers that We call riders, amendments, or endorsements make up the entire contract between You and Us.

1.2 **"You"** and **"Your"** refer to the Insured named in the Policy Schedule.

1.3 **"We"**, **"Us"** and **"Our"** refer to The Paul Revere Life Insurance Company. Our Home Office is 18 Chestnut Street, Worcester, Massachusetts, 01608.

1.4 **"Date of Issue"** means the date that the Policy becomes effective. It is shown on the Policy Schedule. .

1.5 **"Injury"** means accidental bodily injury sustained after the Date of Issue and while Your Policy is in force.

1.6 **"Sickness"** means sickness or disease which first manifests itself after the Date of Issue and while Your Policy is in force. It includes Disability due to complications of pregnancy or childbirth. It includes Disability due to normal pregnancy or childbirth after You have been Disabled for 90 days.

1.7 **"Physician"** means any licensed practitioner of the healing arts practicing within the scope of his or her license. A Physician must be a person other than You.

1.8 **"Physician's Care"** means the regular and personal care of a Physician which, under prevailing medical standards, is appropriate for the condition causing the disability.

1.9 **"Your Occupation"** means the occupation or occupations in which You are regularly engaged at the time Disability begins.

1.10 **"Total Disability"** means that because of Injury or Sickness:

    a. You are unable to perform the important duties of Your Occupation; and
    b. You are receiving Physician's Care. We will waive this requirement if We receive written proof acceptable to Us that further Physician's Care would be of no benefit to You.

If You retire prior to age 65, then "Total Disability" shall mean You are completely unable to engage in the normal activities of a retired person of like age and good health. If You retire prior to age 65, then this definition remains in effect until your 65th birthday.

1.11 **"Residual Disability"**, prior to the Commencement Date, means that due to Injury or Sickness which begins prior to age 65:

    a. (1) You are unable to perform one or more of the important duties of Your Occupation; or

       (2) You are unable to perform the important duties of Your Occupation for more than 80% of the time normally required to perform them; and

    b. You are receiving Physician's Care. We will waive this requirement if We receive written proof acceptable to Us that further care would be of no benefit to You; and

    c. You are not Totally Disabled.

As of the first Commencement Date to occur, Residual Disability means that due to the continuation of that Injury or Sickness:

    a. You incur a Loss of Earnings while You are engaged in Your Occupation or another occupation; and

    b. You are receiving Physician's Care. We will waive this requirement if We receive written proof acceptable to Us that further care would be of no benefit to You; and

    c. You are not Totally Disabled.

Residual Disability must follow right after a period of Total Disability that lasts at least as long as the Qualification Period, if any. This period is shown on the Policy Schedule.

1.12 **"Recovery"** means a period which begins prior to age 65 during which:

    a. You incur a Loss of Earnings which follows Total or Residual Disability which continued at least to the Commencement Date; and

    b. The Loss of Earnings is due to the prior Injury or Sickness which caused the Total or Residual Disability; and

    c. You are working full time in Your Occupation. "Full time" means at least as many hours as You were working before Your Disability began.

1.13 **"Disability"or "Disabled"** refers to a continuing period of Total and/or Residual Disability. For a Maximum Benefit Period "To Age 65" or "Lifetime", successive periods will be deemed to be continuing if:

    a. Due to the same or related causes; and

    b. Separated by no more than 12 months;

For all other Maximum Benefit Periods, successive periods will be deemed to be continuing if:

    a. Due to the same or related causes; and

    b. Separated by no more than 6 months.

Otherwise such periods will be deemed to be new and separate Disabilities. The Maximum Benefit Period is shown on the Policy Schedule.

1.14 **"Commencement Date"** is the day shown on the Policy Schedule when benefits begin during a Disability.

1.15 **"Maximum Benefit Period"** is the longest period of time for which We will pay benefits during any Disability. It is shown on the Policy Schedule.

We will not pay Residual Disability or Recovery benefits beyond the later of:

    a. Your 65th birthday; or
    b. The date on which 24 months of Disability benefits have been paid.

# PART 2
# BENEFITS

The monthly benefits payable under this Policy are subject to the terms of Part 9 "Claims".

## 2.1 TOTAL DISABILITY BENEFIT

We will periodically pay a Total Disability benefit during Your Total Disability. The monthly amount We will pay is the Maximum Monthly Amount.  It is shown on the Policy Schedule.

This benefit will begin on the Commencement Date. We will continue to pay it while You remain Totally Disabled. But in no event will We pay beyond the Maximum Benefit Period. For periods of less than a month, We will pay 1/30th of the benefit for each day of Total Disability.

*What is the Total Disability benefit?*

## 2.2 RESIDUAL DISABILITY BENEFIT

We will periodically pay a Residual Disability benefit during Your Residual Disability.

The monthly amount We will pay equals:

$$\frac{\text{Loss of Earnings}}{\text{Prior Earnings}} \quad \text{X} \quad \text{Maximum Monthly Amount}$$

During any Disability each of the first 6 monthly payments of this benefit will not be less than 50% of the Maximum Monthly Amount.

*When is the Residual Disability benefit payable?*

The benefit will begin on either the Commencement Date or the day after Your Total Disability ends, if later. We will pay this benefit while Your Residual Disability continues, but not beyond the Maximum Benefit Period. For periods of less than a month, We will pay 1/30th of the benefit for each day of Residual Disability.

**"Loss of Earnings"** for any month means Your Prior Earnings minus Your Monthly Earnings for the month for which a benefit is claimed.  This difference will be considered Loss of Earnings to the extent it is due to the Injury or Sickness which caused the Disability. The Loss of Earnings must be at least 20% of Prior Earnings.

*How is the Residual Disability benefit calculated?*

If the Loss of Earnings for any month is 75% or more of Prior Earnings, We will deem the loss to be 100% of Prior Earnings.

**"Prior Earnings"** means the greater of:

    a.   Your average Monthly Earnings for the year just before Your Disability began; or

    b.   Your highest average Monthly Earnings for any 2 successive years during the 5 year period just before Your Disability began.

Starting as of the first Review Date, We will make an inflation adjustment to Your Prior Earnings. We will multiply Your Prior Earnings by the CPI Factor. The result will be used until the next Review Date to compute Residual Disability benefit amounts payable. However, the inflation adjustment increase will be at least 7% of Your Prior Earnings amount.

The inflation adjustment will not apply once the Disability ends. But it will apply to recurrent Disability deemed continuing under the Recurrent Disability section of Your Policy.

**"CPI"** means the Consumer Price Index for All Urban Consumers. It is published by the United States Department of Labor. If this index is discontinued or if the method for computing it is materially changed, We may choose another index. We will choose an index which in Our opinion would most accurately reflect the rate of change in the cost of living in the United States. CPI will then mean the index We chose.

**"Review Date"** means the date that occurs:

    a.   After each successive 12 months of Disability; and

    b.   While Your Disability continues.

No Review Date will occur on or after Your 65th birthday.

**"Index Month"** means the calendar month four months prior to the calendar month in which a Review Date occurs. But the first Index Month for any Disability will be the calendar month 4 months prior to the month in which Your Disability began.

**"CPI Change"** means the result of a computation We will make as of each Review Date. We will divide the CPI for the most recent Index Month by the CPI for the Index Month prior to the most recent Index Month.

**"CPI Factor"** means the result of the CPI Change as of the current Review Date multiplied by the CPI Change for each prior Review Date occurring since the Disability began. The CPI Factor as of the first Review Date will equal the CPI Change as of that Review Date. A CPI Factor is determined as of each Review Date while Disability continues.

**"Monthly Earnings"** means Your salary, wages, commissions, bonuses, fees, and income earned for services performed. If You own any portion of a business or profession, it means:

    a.   Your share of the income earned by that business or profession;

    b.   Less Your share of business expenses which are deductible for Federal income tax purposes;

    c.   Plus Your salary and any contributions to a pension or profit sharing plan made on Your behalf.

Monthly Earnings does not include:

    a.   Income from deferred compensation plans, disability income policies, or retirement plans; or

    b.   Income not derived from Your vocational activities.

We will allow either the cash or accrual accounting method. But during a Disability the same method must be used when determining Loss of Earnings.

## 2.3    RECOVERY BENEFIT

We will periodically pay a Recovery benefit during Your Recovery.    The monthly amount We pay will be calculated as if You were Residually Disabled.

This benefit will begin on the day after Your Total or Residual Disability ends. We will continue to pay this benefit while Your Recovery continues. We will not pay beyond the end of the Maximum Benefit Period.

## 2.4    PRESUMPTIVE TOTAL DISABILITY BENEFIT

If Injury or Sickness causes You to totally and irrecoverably lose:

a.    Your power of speech; or
b.    Your hearing in both ears; or
c.    Your sight in both eyes; or
d.    Use of both hands; or
e.    Use of both feet; or
f.    Use of one hand and one foot;

We will presume You to be Totally Disabled as long as such loss continues and whether or not You are able to work or require Physician's Care.

The Total Disability benefit will begin on the date of the above loss. We will pay it for the amount and Maximum Benefit Periods shown on the Policy Schedule. But We will pay benefits for Your lifetime if; a) the Maximum Benefit Period is "to age 65" or "lifetime"; and b) such loss occurs prior to age 65.

## 2.5    TOTAL DISABILITY BECAUSE OF COSMETIC OR TRANSPLANT SURGERY

After 6 months from the Date of Issue, if You become Totally Disabled because You have surgery to:

a.    Improve Your appearance or prevent disfigurement; or
b.    Transplant part of Your body to someone else;

We will consider You to be Totally Disabled due to Sickness.

*Can benefits be paid if not Disabled?*

*Can Total Disability be automatically assumed?*

*Is cosmetic or transplant surgery covered?*

**2.6    REHABILITATION**

*What happens if a program of retraining or rehabilitation is entered?*

We will pay for the cost of services incurred in connection with a program of vocational rehabilitation if:

a.  We enter into an agreement with You on both the program and the services; and
b.  The cost of the services is not covered by another plan or program.

Participating in such a program will not affect Your eligibility for benefits under Your Policy.

**2.7    SURVIVOR BENEFIT**

*Is there a benefit if You die?*

If You die after the Commencement Date and prior to age 65, and while You are eligible for Total Disability benefits, We will pay to Your beneficiary 3 times the Maximum Monthly Amount payable at the time You die. Your beneficiary will be Your estate. But You may name someone else by writing to Us.

# PART 3
# EXCLUSIONS

**3.1    EXCLUSIONS**

*When are you not covered?*

We will not pay Policy benefits:

a.  Due to an act or accident of war, whether declared or undeclared; or
b.  Due to normal pregnancy or childbirth except as described in the definition of Sickness; or
c.  For any period You are incarcerated.

**3.2    PRE-EXISTING CONDITION**

*What if a disability results from a Pre-existing Condition?*

During the first two years from the Date of Issue, We will not pay benefits for a Pre-Existing Condition if it was not disclosed on Your application. Pre-Existing Condition means any condition that was diagnosed or treated by a Physician within 24 months prior to the Date of Issue or produced symptoms within 12 months prior to the Date of Issue that would have caused an ordinarily prudent person to seek medical diagnosis or treatment.

Also We will not pay benefits for any loss We have excluded by name or specific description.

# PART 4
# PREMIUM AND REINSTATEMENT

## 4.1    PAYMENT OF PREMIUM

The first premium on Your Policy is payable on the Date of Issue. After that, premiums are payable in the amount and mode shown on the Policy Schedule. Payments may be made at Our Home Office, 18 Chestnut Street, Worcester, Massachusetts 01608, or to Our agent.

Premiums may be paid annually or semi-annually. If Our rules permit it, You can pay the premiums quarterly or monthly. We will allow You to change this by written request. But, We will not allow a change while You are Disabled.

*When are premiums due?*

## 4.2    GRACE PERIOD

After the first premium has been paid, a grace period of 31 days is allowed for late payment of premium. Your Policy will remain in force during the grace period.

If the premium is not paid when it is due or within the grace period, the Policy will lapse.

*What happens if a premium payment is late?*

## 4.3    REINSTATEMENT

If Your Policy lapses because the premium is not paid when due or within the grace period, it will be reinstated if We or Our agent accepts payment of the premium without requiring a reinstatement application.

If We receive the premium due at Our Home Office within 57 days from the date the premium was due, We will not require evidence of Your insurability.

If We receive the premium after 57 days, We will require a reinstatement application. We will issue You a conditional receipt for the premium. If We approve Your application, the Policy will be reinstated as of the date of Our approval. If We disapprove Your application, We must do so in writing within 45 days of the date of the conditional receipt or the Policy will be reinstated on the 45th day.  The reinstated Policy will cover only loss due to:

a.    Injury sustained after the date of reinstatement; or
b.    Sickness that begins more than ten days after such date.

Except for this and any new provisions that are added to the reinstated Policy, Your rights and Our rights will be the same as before the Policy lapsed.

*How can a lapsed Policy be reinstated?*

## 4.4    PREMIUM REFUND AT DEATH

Upon notice of Your death, We will make a pro rata refund of any premium actually paid for a period beyond the date of Your death.

*Is there any premium refund at death?*

## PART 5
## WAIVER OF PREMIUM

### 5.1  WAIVER OF PREMIUM

*When will premiums be waived?*

After You have been Disabled for 90 days, We will waive any premium that becomes due while You remain Disabled. Your Policy and its benefits will continue as if the premium had been paid.

We will also refund any premium paid that became due during those first 90 days of Disability.

When You are no longer eligible for Waiver of Premium, You can continue Your Policy in force by paying the next premium that becomes due.

Waiver of Premium will not apply to any premiums which become due after You elect the RENEWAL OPTION IF NOT EMPLOYED. HOSPITAL CONFINE-MENT INDEMNITY BENEFIT in PART 8.

## PART 6
## RECURRENT AND CONCURRENT DISABILITY

### 6.1  RECURRENT DISABILITY

*What if a disability reoccurs?*

a.  For Maximum Benefit Periods "To Age 65" and "Lifetime":

If after the end of a Disability You become Disabled from the same or related causes, We will deem it a separate Disability. But if such recurrence occurs within 12 months of the end of the prior period, We will deem it a continuation of the prior Disability.

Such periods of Recurrent Disability separated by 12 months or less will be deemed to be continuing in order to determine the Commencement Date. Such periods of Recurrent Total Disability separated by 12 months or less will be deemed to be continuing in order to determine completion of the Qualification Period, if any.

b.  For All Other Maximum Benefit Periods:

If after the end of a disability You become Disabled from the same or related causes, We will deem it a separate Disability. But if such recurrence occurs within 6 months of the end of the prior period, We will deem it a continuation of the prior Disability.

Such periods of Recurrent Disability separated by 6 months or less will be deemed to be continuing in order to determine the Commencement Date. Such periods of Recurrent Total Disability separated by 6 months or less will be deemed to be continuing in order to determine completion of the Qualification Period, if any.

### 6.2  CONCURRENT DISABILITY

*What if a disability is due to more than one cause?*

If a Disability is caused by more than one Injury or Sickness, or from both, We will pay benefits as if the Disability was caused by only one Injury or Sickness.

We will not pay more than one Disability benefit for the same period. We will always pay the largest benefit.

## PART 7
## RENEWAL OPTION IF EMPLOYED. TOTAL DISABILITY BENEFIT — LIMITED BENEFIT PERIOD

### 7.1   RENEWAL OPTION

After Your 65th birthday You may continue Your Policy for the Total Disability benefit while:

  a.   You remain actively and regularly employed full time for at least 30 hours per week; and
  b.   The premium is paid on time.

We can require proof after Your 65th birthday that You have continued to be actively and regularly employed full time.

You cannot elect this option after the RENEWAL OPTION IF NOT EMPLOYED. HOSPITAL CONFINEMENT INDEMNITY BENEFIT in PART 8 becomes effective.

The Policy must be in force when You elect this option.

*Can the Policy be renewed after age 65 if You are still working?*

### 7.2   TOTAL DISABILITY BENEFIT — LIMITED BENEFIT PERIOD

If You elect this option, We will pay the Total Disability amount subject to the same provisions, exceptions, and limitations in the Policy.

For Total Disability starting:

  a.   After Your 65th birthday, but before Your 75th birthday, the Maximum Benefit Period will be 24 months or the period shown on the Policy Schedule if less; and
  b.   After Your 75th birthday, the Maximum Benefit Period will be 12 months.

*How will the benefit period be limited?*

### 7.3   PREMIUMS

The premium will be the rate then in effect for Your rating group.  We can change the premium rate but only if We change the rate for everyone who has this policy form in Your rating group in Your state.

Any premium paid after Your 65th birthday for a period not covered by Your Policy under this option will be returned to You. Or at Your request, We will apply it to the premium payable under the RENEWAL OPTION IF NOT EM-PLOYED. HOSPITAL CONFINEMENT INDEMNITY BENEFIT in PART 8.

*What will the premium be?*

## PART 8
## RENEWAL OPTION IF NOT EMPLOYED.
## HOSPITAL CONFINEMENT INDEMNITY BENEFIT

### 8.1   RENEWAL OPTION

*Can the Policy be renewed after age 65 if not working?*

When You are no longer actively and regularly employed after Your 65th birthday You may continue Your Policy for the rest of Your life, as long as the premium is paid on time. The benefit will be limited to a Hospital Confinement Indemnity. This benefit will take the place of all other benefits under Your Policy and, unless We state otherwise, any benefits under riders added to the Policy.

The Policy must be in force when You elect this option.

### 8.2   HOSPITAL CONFINEMENT INDEMNITY BENEFIT

*What will the benefit be?*

If You elect this option, We will pay You a Hospital Confinement Indemnity of 100 dollars per day while You are confined in a legally operated hospital because of Injury or Sickness.

This benefit will begin on the date You are confined. We will continue to pay it while You are confined. But We will not pay for more than 6 months during each continuous confinement.

For the purpose of this benefit, after a period of confinement ends and You are confined again from the same or related cause within 180 days, We will consider it to be a continuation of the first confinement.

For the purpose of this benefit, "hospital" will <u>not</u> mean:

   a.  A place of convalescence, nursing home care, or care for the aged; or

   b.  A place for the care or treatment of mental disorders, drug addiction, or alcoholism; or

   c.  A place that is used primarily for custodial, educational, or rehabilitative care.

### 8.3   EXCEPTIONS

*What other Policy provisions will change?*

Under this option, the Waiver of Premium, the Recurrent Disability, and Benefit provisions of the Policy will not apply. However, all of the other provisions, exceptions, and limitations in the Policy will apply.

### 8.4   PREMIUMS

*What will the premium be?*

The premium will be the rate then in effect for Your rating group. We can change the premium rate but only if We change the rate for everyone who has the policy form in Your rating group in Your state.

# PART 9
# CLAIMS

## 9.1  TIME OF LOSS

All losses must occur while Your Policy is in force. But, termination of Your Policy will not affect any claim for Total Disability that begins within 30 days of the date of an Injury causing such Disability.

*When must losses occur?*

## 9.2  WRITTEN NOTICE OF CLAIM

Written notice of claim must be given to Us within 30 days after a covered loss starts. If this cannot be done, then notice must be given as soon as reasonably possible.

The notice will be sufficient if it identifies You and is sent to Our Home Office, 18 Chestnut Street, Worcester, Massachusetts 01608, or is given to Our agent.

*When must written notice be given?*

## 9.3  CLAIM FORMS

After We receive the written notice of claim, We will send You Our proof of loss forms within 15 days. If We do not, You will meet the written proof of loss requirements if You send Us, within the time set forth below, a written statement of the nature and extent of Your loss.

*Is there a form for proof of loss?*

## 9.4  WRITTEN PROOF OF LOSS

Written proof of loss must be sent to Us within 90 days after the end of each period for which You are claiming benefits. If that is not reasonably possible, Your claim will not be affected. But, unless You are legally incapacitated, written proof must be given within one year of the date it was required.

We can also require reasonable proof from You of Your:

a.  Prior Earnings; and
b.  Monthly Earnings for the month for which Disability is claimed.

This may include personal and business tax returns filed with the Internal Revenue Service, financial statements, accountant's statements or other proof acceptable to Us or which We may require. We can have an audit performed as often as is reasonably required while Your claim is continuing. Such an audit will be at Our expense.

*What types of proof of loss might be required?*

## 9.5  EXAMINATIONS

At Our expense, We can have a Physician of Our choice examine You as often as reasonably required while Your claim is continuing.

*Can there be an independent exam performed?*

## 9.6  TIME OF PAYMENT OF CLAIMS

After We receive satisfactory written proof of loss:

a.  We will pay any benefits then due that are not payable periodically; and
b.  We will pay at the end of each 30 days any benefits due that are payable periodically — subject to continuing proof of loss.

We will pay You interest at the rate of 8 percent per year on the benefits due under the terms of the Policy if We fail to comply with a. and b. above.

*When will benefits be paid?*

### 9.7    PAYMENT OF CLAIMS

*To whom will benefits be paid?*

All benefits will be paid to the Policy Owner named on the Policy Schedule. If any benefit is payable to Your estate or if You are not competent to give a valid release, We can pay up to 1,000 dollars to one of Your relatives who We believe is entitled to it.  If We do that in good faith, We will not be liable to anyone for the amount We pay.

### 9.8    ASSIGNMENT

*When must notice of an assignment be sent?*

We will not be bound by an assignment of Your Policy or any claim unless We receive a written assignment at Our Home Office before We pay the benefits claimed. We will not be responsible for the validity of any assignment. An absolute assignment is a change of Policy Owner to the assignee. A collateral assignment is not a change of Policy Owner; in this case benefits will be paid jointly to the Policy Owner and the assignee.

### 9.9    MISSTATEMENT OF AGE

*What if there is a misstatement of age?*

If Your age has been misstated, the benefits under the Policy will be those that the premium You paid would have purchased at Your correct age.

## PART 10
## THE CONTRACT

### 10.1    ENTIRE CONTRACT; CHANGES

*Can the Policy be changed?*

This Policy (with the application and attached papers) is the entire contract between You and Us.  No change in this Policy will be effective until approved by a Company officer.   This approval must be noted on or attached to this Policy.  No agent may change this Policy or waive any of its provisions.

### 10.2    INCONTESTABLE

*For how long is the Policy contestable?*

a.   After Your Policy has been in force for 2 years, excluding any time You are Disabled, We cannot contest the statements in the application.

b.   No claim for loss incurred or Disability that starts after 2 years from the Date of Issue will be reduced or denied because a sickness or physical condition not excluded by name or specific description before the date of loss had existed before the Date of Issue.

### 10.3    CONFORMITY WITH STATE STATUTES

*What if the Policy differs with state requirements?*

Any provision in this Policy which, on its Date of Issue, conflicts  with the laws of the state in which You reside on that date is amended to meet the minimum requirements of such laws.

### 10.4    LEGAL ACTION

*When can legal action be brought under this Policy?*

You cannot bring legal action within 60 days from the date written proof of loss is given. You cannot bring it after 3 years from the date written proof of loss is required.

## FUTURE INCOME OPTION BENEFIT RIDER

**DEFINITIONS.** In this Rider:

*"Policy Benefit"* means the Maximum Monthly Amount payable under Your Policy to which this Rider is added. That amount is shown on the Policy Schedule.

*"Option Date"* means each even-numbered anniversary of the Date of Issue that occurs on or before the Expiration Date.

*"Unit of Increase"* is an amount by which the Policy Benefit can be increased on an Option Date. That amount is shown on the Policy Schedule. The maximum number of Units of Increase is also shown on the Policy Schedule.

*"Expiration Date"* is the date this Rider ends. That date is shown on the Policy Schedule.

*"Earned Income"* means the greater of Your average Monthly Earnings for:
1. The year just before the date of Your request for an increase in the Policy Benefit; or
2. Any two successive years during the five-year period just before the date of Your request.

All definitions in Your Policy apply to this rider. All provisions of Your Policy stay the same except where We change them by this rider.

## FUTURE INCOME OPTION BENEFIT.

You may apply for up to one Unit of Increase as of any Option Date. You may apply for part of a Unit of Increase as of any Option Date.

If all or part of a Unit of Increase is not used as of an Option Date, You may carry it over and apply for it on the next Option Date. But You cannot carry it over beyond that Option Date.

On any Option Date prior to age 42, You may also apply for up to one added Unit of Increase if You are not Disabled and You exercise all of Your current Unit of Increase. This added Unit of Increase may not be exercised more than once.

To use all or part of a carried-over Unit of Increase You must also exercise all of Your current Unit of Increase. The total number of Units of Increase exercised can never exceed the maximum number of Units of Increase shown on the Policy Schedule.

If You qualify, We will increase Your Policy Benefit by the amount for which You apply.

HR7E

## TO QUALIFY FOR AN INCREASE.

You will qualify for an increase if, at the time You apply:

1. Your Earned Income is sufficient for an increase. This will be determined by Our published underwriting rules and issue and participation limits in effect at the time You apply; and

2. The sum of all of Your disability income coverage, after the increase, is not more than the maximum coverage We offer to new applicants of Your class of risk. This will be determined by Our published underwriting rules and issue and participation limits in effect at the time You apply. We will figure the sum of Your disability income coverage by adding up the benefits You would receive from:

   a. Us; and
   b. Any other insurer; and
   c. Any government agency.

We may require proof of Your Earned Income. This could include tax returns or other proof which We may require.

## APPLICATION FOR AN INCREASE.

You may apply for an increase as of any Option Date. We will send You an application form. This form must be completed and returned to Us within 60 days before the Option Date. This form will ask You for a statement of Your Earned Income and disability income coverage. This form will not ask You for proof of good health.

You may apply for no more than one Unit of Increase during any continuing disability.

## WHEN AN INCREASE IS PAYABLE.

An increase in Your Policy Benefit under this rider will be effective as of the applicable Option Date. But if the Option Date upon which an increase is elected occurs while You are disabled, We will begin to pay the increased Policy Benefit on the ninety-first day of continuous disability after that Option Date. We will pay the increased Policy Benefit while Your disability continues and while the Policy Benefit is payable.

## THE PREMIUM.

The premium for each increase will be at the rate for Your age at Your nearest birthday on the applicable Option Date. We will figure this according to either:

1. Your class of risk when We issued Your Policy; or
2. Your class of risk on the Option Date of the increase;

whichever is more favorable to You.

Also, if the premium for Your Policy is being waived on the Option Date, You will not have to pay the premium for the increase until the premium for Your Policy becomes payable again.

You must make the first payment of the premium for an increase to Our Home Office or to Our agent. This must be done no later than 31 days after the Option Date.

## TERMINATION.

This rider will end when one of the following happens:

1. The Expiration Date for this rider; or
2. When the total of all increases in the Policy Benefit equals the value of the maximum Units of Increase shown on the Policy Schedule; or
3. A premium for the Policy or this rider is not paid on time; or
4. Upon Your written request to end this rider. In that case, You must return the Policy to Us. We will make the proper endorsement and reissue the Policy to You.

The annual premium for this Rider is shown in the Policy Schedule.

The premium charge for this Rider will end when the Rider ends.

The Date of Issue of this Rider is the same as that of Your Policy. If We issued this Rider after Your Policy, the Date of Issue is shown on the Policy Change form issued with this Rider.

Signed for Us at Worcester, Massachusetts.

THE PAUL REVERE LIFE INSURANCE COMPANY

*John H. Budd*          *Charles E. Soule*

Secretary                    President

| ...CATION FOR ...BILITY INSURANCE TO: | **THE PAUL REVERE LIFE INSURANCE COMPANY** | 9/u | WORCESTER, MA 01608 № 137466 |
|---|---|---|---|

a. Name (Print): _Pekin_        _Michael_
(Incl. Prof. Title)     Last        First        MI

b. Soc. Sec. #
c. Ht. 5'8   d. Wt. 145

e. Sex M ☑ F ☐   f. Birthdate: 1/3/62   g. Age (nearest): 31
h. Birthplace (State) IC

Residence Address: 480 N. McClurg Ct #920 Chicago, IC 60611 (312) 644-0814
Street        Apt. #        City        State        Zip        Phone

Business Address: 100 N. Lasalle #1515   60602 Chgo, Il (782)-6717

a. Occupation: Lawyer
b. Employer: Pekin & Pekin

c. Exact duties: dry cases, litigate

d. Length of current employment: 1987
e. Nature of Employer's business: law firm

f. If owner, percentage owned: 25%   Length of Ownership: 4 yrs   # full time employees: 8

g. Type of Business Entity: Sole Proprietor ☐  Partnership ☑ Corporation ☑ Other ☐ describe:

**3.** Have you within the past **2 years** engaged in motorcycle riding, scuba diving, racing or any similar sport or avocation?
Yes ☐ No ☑ If "yes" give details: _____

**4.** Have you smoked cigarettes in the past **12 months**?        Yes ☐ No ☑

**5.** Have you been actively at work full-time for the past **6 months**?        Yes ☑ No ☐
If "No" give details: _____        MP

**Questions 6 and 7 need not be answered if a Paul Revere Medical Exam is required.**

**6.** Have you **ever** been treated for or had any known indication of: (*Circle* all conditions that apply and give details below)

a. Chest pain, high blood pressure, mental or emotional disorder, arthritis, diabetes, cancer, tumor, or fainting spells?        Yes ☐ No ☑

b. Disease or disorder of the heart or circulatory system, lungs, kidneys, bladder, genital or reproductive organs, brain or nervous system, skin, eyes, ears or speech?        Yes ☐ No ☑

c. Disease or disorder of the (stomach) or intestines, liver, thyroid, bones, muscles, joints, back or neck?        Yes ☑ No ☐

d. Complications of pregnancy? Yes ☐ No ☑ Are you currently pregnant? Yes ☐ No ☑ Due date: _N/A_

**7.** In the past **5 years**, have you had any medical advice or operation, physical exam, treatment, illness, abnormality or injury not listed above? Yes ☑ No ☐        Are you currently receiving any medical advice or treatment? Yes ☑ No ☐

**8.** Have you **ever** used stimulants, hallucinogens, narcotics or any controlled substance other than prescribed by a physician, or been counseled or treated for excess use of alcohol or drugs?        Yes ☐ No ☑
MP

**9.** Give details to all "Yes" answers to 6, 7 or 8. Include exact diagnoses, dates, duration, physicians and addresses.
_6. Irritable Bowel, Dr. Steven Hanauer, University of_
_Chicago, sees 1x a year at most._

_7. Same as 6_
_8. Lomotel 4x daily- (for stomach)_

**10.** In the past **5 years** have you had any insurance application rejected or modified or received or been refused any disability or medical benefits? Yes ☐ No ☑ If "yes" give details: _____

| **11.** Fill in amounts as Reportable for Federal Tax purposes | Estimated Current Annual Rate | Actual Last year 19 9? | Actual 2 Years Ago 19 91 |
|---|---|---|---|
| a. Salary, Fees, Commissions & Bonus | $300,000 | $150,000 | $125,000 |
| b. Pension and Profit Sharing Contributions | | | |
| c. Earnings from other occupations (describe): | | | |
| d. Total Earnings (a + b + c) | | | |
| e. Deductible Business Expenses | | | |
| f. NET EARNED INCOME (d – e) | | | |

**12.** List Net worth (assets minus liabilities), if more than $750,000: $ _N/I_

**13.** List unearned income (interest, dividends, capital gains, rent, etc.), if more than $15,000 per year: $ _N/A_

PD 64A        PC 4

14. Describe all disability coverage in force, and all coverage applied for in the past 12 months. Indicate if it is:
A) Individual, B) Social Security Substitute, C) Association, D) Group, E) Salary Continuation, F) Overhead Expense, or
G) Buy-Out. If none, write "none".  *None*

| Company or Source If Paul Revere, give Pol. # If pending, check | Type (A,B,C, etc.) | Monthly Amount | Elim. Period | Benefit Period | Will coverage be Replaced/Changed or Madeover? | Effective Date of Discontinuance |
|---|---|---|---|---|---|---|
| *None* | | *5,000* | *9m* | *65* | Yes ☐ No ☑ | |
| | | | | | Yes ☐ No ☐ | |
| | | | | | Yes ☐ No ☐ | |
| | | | | | Yes ☐ No ☐ | |

15. Describe Coverage Being Requested (If BOE, complete supplement):

| Plan Code: *990* | Monthly Amt. | Elim. Period | Benefit Period | Form # | Optional Benefits Amount | Form # | Amount |
|---|---|---|---|---|---|---|---|
| Base | *5,000* | *90* | *65* | *875* | *C 1000* | | |
| AMI | | | | *OwnOcc* | *5000* | | |
| AMI | | . | | *AIB* | *5%* | | |
| SSIB | | | | | | | |

16. a. Will requested coverage be paid for by employer? Yes ☐ No ☑ If "yes" how much? _____ %
Will employer's contribution be included in your taxable income? Yes ☐ No ☑
b. List name and address of proposed owner if other than proposed insured _____
c. Send notices to:    Residence ☐    Business ☑
d. Collected with this application in exchange for Conditional Receipt: $_____

### CORRECTIONS AND AMENDMENTS (For Home Office Use Only)

It is understood and agreed as follows:
- I have read the statements and answers recorded above. They are, to the best of my knowledge and belief, true and complete and correctly recorded. They will become part of this Application and the basis for any policy issued on it.
- I will permanently discontinue all policies shown to be discontinued in answer to question 14 on or before the dates indicated. If not, benefits under any policy issued on this application may be reduced by the amount payable under such existing policies.
- No agent or broker has authority to waive the answer to any question, to determine insurability, to waive any of the Company's rights or requirements, or to make or alter any contract or policy.
- The insurance applied for will not take effect unless the issuance and delivery of the policy and payment of the first premium occur while the health of the Proposed Insured remains as stated in the Application. The only exception to this is the insurance provided in the Conditional Receipt detached herefrom and issued if at least the Minimum Deposit is made with the Application.
- Acceptance by the Proposed Insured/Owner of any policy issued on this Application will ratify any changes listed under "Corrections and Amendments", except that no changes may be made as to Classification, Age at Issue, Form of Insurance, Amount or Benefits unless agreed to in writing by the Proposed Insured/Owner.

Signed at *Chicago, IL*          Date *9/10* 19 *93*

I certify that I have truly and accurately recorded on this application the information supplied by the Proposed Insured.          X _____
                                                                              Signature of Proposed Insured

Witness _____          X _____
Licensed Agent or Broker          Signature of Proposed Owner (if applicable)

**Applicants will be informed whether or not their application has been accepted within 60 days or be given the reason for any further delay.**

PAGE 2

B



18 Chestnut Street
Worcester, MA 01608-1578
508 799 4441
www.unum.com

VIA FACSIMILE and US MAIL
October 10, 2007

Michael Pekin
926 Bristol Drive
Deerfield, MI  60015

RE:    Claim #:    01-02634929-001

Dear Mr. Pekin:

We have completed our review of the recently provided financial information, which included:

- 2006 business tax returns (form 1065) for Oasis Legal Finance Group, LLC
- 2006 business tax returns (form 1065) for Oasis Legal Finance Operating Company, LLC
- 2006 personal tax returns (for 1040)
- Revised Profit/Loss statements for the period of January through August 2007

Based on the tax returns provided, you had a loss of $(1,360,975.00) for 2006. Please see the enclosed "Earnings Analysis" spreadsheets for the specific calculations. Although there is a small variance between the earnings reported on the monthly profit/loss statements provided for 2006 and the earnings appearing on the tax returns, this variance does not appear to affect the amount of the benefits paid as you received full benefits for the year.

You will recall that on September 6, 2007, we had a conference call with yourself and your Director of Finance, Lou Vena. In this conversation, we discussed the recent changes in the accounting method noted since January 2007. Mr. Vena informed us in this call that the current method of accounting is a more accurate reflection of the business income on a monthly basis. We agreed to use this changed accounting method to calculate your monthly earnings.

We have recalculated your 2007 monthly earnings based on the revised Profit/Loss statements provided.   Please refer to the enclosed "Monthly Residual Worksheet (For Business Owners)" spreadsheets for the specific calculations.

We find that you sustained qualifying losses (>20%) in January 2007 (100%) and March 2007 (63.53%) and were eligible to receive benefits totaling $16,053.60 for this period ($10,000.00 for January '07 and $6,053.60 for March '07).

You did not sustain a qualifying loss in February, April, May, June, July or August 2007 and therefore have not satisfied the policy provisions for Residual Disability for those months.  You are not eligible to receive Residual Disability benefits under the policy for this period.

UNUM IS A REGISTERED TRADEMARK AND MARKETING BRAND OF UNUM GROUP AND ITS INSURING SUBSIDIARIES.

Previously, we had issued benefits totaling $30,000.00 for January through March 2007 ($10,000 per month) based on the prior financial information provided. Benefits on your claim are currently overpaid by $13,946.40 ($30,000.00 minus $16,053.60) based on the revised profit/loss statements, which, according to Mr. Vena, are a more accurate reflection of the business income/expenses. We would appreciate discussing options for repayment of this undue benefit at your earliest convenience.

We would like to remind you that your policy contains the following provision:

> **"Disability" or "Disabled"** refers to a continuing period of Total and/or Residual Disability. For a Maximum Benefit Period "To Age 65" or Lifetime", successive periods will be deemed continuing if:
>
> a.    Due to the same or related causes; and
>
> b.    Separated by no more than 12 months;

March 2007 was the last month in which you where you were last disabled per your policy. You have not been disabled under your policy for five (5) consecutive months (April through August 2007).

Please provide us your information for September 2007 when available for consideration.

If you have any questions regarding this letter or your claim in general, please feel free to contact me at 1-888-226-7959, ext. 75064.

Respectfully,

**FILE COPY**

Scott Allen, ALHC
Senior Disability Benefit Specialist
The Paul Revere Life Insurance Company

Enclosures:
    Claimant Supplemental Statement
    Earnings Analysis Spreadsheet
    Monthly Residual Worksheet (For Business Owners)
    Return Envelope

C

# BARNES & THORNBURG LLP

Suite 4400
One North Wacker Drive
Chicago, IL 60606-2833 U.S.A.
(312) 357-1313
Fax (312) 759-5646

**William M. McErlean**
(312) 214-8820
william.mcerlean@btlaw.com

www.btlaw.com

October 16, 2007

**VIA FEDERAL EXPRESS**

Mr. Scott Allen
Senior Disability Benefit Specialist
The Paul Revere Life Insurance Company
18 Chestnut Street
Worcester, MA 01608-1528

        Re:    Michael Pekin
               Claim No. 01-0263-4929-001

Dear Mr. Allen:

        This office represents Michael Pekin, and we are responding to your letter of October 10, 2007 to Mr. Pekin in which, based on a flawed analysis in violation of the terms of Mr. Pekin's disability insurance policy with The Paul Revere Life Insurance Company (the "Company"), you wrongfully decided to terminate Mr. Pekin's disability coverage effective as of February of this year.

        In sum, you seized upon a change in accounting method from cash to accrual basis in 2007 by Mr. Pekin's employer Oasis Legal Finance, LLC ("Oasis") to arrive at a predetermined result. Clearly "Earnings" under the policy means income received by an insured for services performed, including any income payments by any company or business in which an insured is an owner. We have no quibble with that position. However, the term "Earnings" does not include phantom book income generated by an accounting methodology that will not generate actual dollars for Oasis, much less earnings or dividends to Mr. Pekin, who is a minority shareholder in Oasis and has no ability to direct the accounting method selected by Oasis. Thus, to conclude that this change in the accounting methodology by Oasis can be used by the Company to claim Mr. Pekin's percentage share of phantom income never received by Oasis or distributed to any owner is to be included in "Earnings" is spurious.

        Moreover, Mr. Pekin certainly did not agree that the Company could use this change in accounting methodology to Mr. Pekin's detriment. He did not.[1] In fact, under the policy the

---

[1] We also believe your letter incorrectly paraphrases Mr. Vena's statements as to the reason for the change in methodology. Mr. Vena did not claim that the change in methodology produces a more accurate reflection of Oasis' income. In point of fact, it does not. It provides perhaps a more accurate portrayal of Oasis' future business prospects.

Mr. Scott Allen
Senior Disability Benefit Specialist
The Paul Revere Life Insurance Company
October 16, 2007
Page 2

Company is precluded from doing so and is required to use the same methodology during the disability period. On a cash basis, which Oasis used until this year, only losses were and are generated and the Company in calculating "Loss of Earnings" is bound to this methodology.

We demand that the Company revisit and rescind this unfortunate and wrongful decision. A prompt response would be appreciated.

Sincerely yours,

BARNES & THORNBURG LLP

William M. McErlean

WMM/pab

cc:    Michael S. Pekin

CHDS01 WMCERLEAN 424007v1

BARNES & THORNBURG LLP

D



18 Chestnut Street
Worcester, MA
01608-1528
508 799 4441
www.unum.com

**VIA FACSIMILE & US MAIL**
October 19, 2007

William M. McErlean
Barnes & Thornburg, LLP
1 North Wacker Drive, Suite 4400
Chicago, IL 60606-2833


RE:          Michael Pekin
             Claim # 01-02634929-001

Dear Mr. McErlean:

We are in receipt of your letter of October 16, 2007. We respectfully request written confirmation
from Mr. Pekin confirming your representation.

We would like to take this opportunity to address the concerns raised in your letter and to inform you
of the events that preceded our letter of October 10, 2007 (copy enclosed).

Mr. Pekin's disability coverage has not been "terminated" as you have indicated in your October 16,
2007 letter. Mr. Pekin's policy coverage remains in force and we continue to evaluate his eligibility for
benefits under this coverage based on the information provided to us. When evaluating a claim for
disability benefits, we compare the specific circumstances of a claim to the coverages provided by the
policy. The determination of an individual's eligibility for policy benefits is made in accordance with
the terms and conditions set forth in the policy itself.

The information provided to us presently has conveyed that Mr. Pekin did not sustain a qualifying loss
in February, April, May, June, July or August 2007 and therefore was not eligible to receive Residual
Disability benefits, as outlined by the policy, for this period. We conveyed this finding in our letter
dated October 10, 2007. We will continue to evaluate his eligibility for future benefits upon receipt of
written proof of loss as outlined in the contract that is policy # 01026349290.

You have indicated that we have *"seized upon a change in accounting method...to arrive at a
predetermined result."* We would like to make you aware this recent review was initiated at the
request of Mr. Pekin himself. The financial information Mr. Pekin provided to us on March 8, 2007 for
the period of January 2007 conveyed that he did not sustain a qualifying loss for Residual Disability
benefits. We informed him of these findings in a letter on March 22, 2007 and spoke to him directly
on April 2, 2007. During our discussion, Mr. Pekin indicated that he could see how we arrived at our
calculations using the information he provided and indicated that he wasn't sure about the accuracy of
the information being provided and advised us that he was going to discuss this further with his
financial department at Oasis.

On April 6, 2007, we received, via fax, a copy of a letter dated April 5, 2007 from Mr. Lou Vena,
Director of Finance, Oasis Legal Finance (copy enclosed). This letter informed us that *"Mr. Pekin's
compensation is exclusively derived from his annual salary and he is eligible for an annual bonus."* We
appreciate this position; however, using just his annual salary and annual bonus in the calculation of
his current earnings would be inconsistent with how his Prior Earnings were determined. Mr. Pekin's
Prior Earnings comprised of W-2 wages, guaranteed payments, business profit/losses and pension
contributions. To exclude one or more of these sources now in the computation of current earnings
would result in an inaccurate measurement of his loss of earnings and would not be consistent with
the terms and conditions of his policy.

Unum is a registered trademark and marketing brand of Unum Group and its insuring subsidiaries.

After receiving additional information from Mr. Pekin, a conference call occurred on September 6, 2007 with Mr. Pekin and Mr. Vena to discuss the information received. In this call, we reviewed with Mr. Pekin and Mr. Vena that the Prior Earnings amount was determined using information prepared using the cash method of accounting. We informed him that a change in the accounting method to accrual basis affects our ability to make accurate loss calculations. We informed him of this and requested cash-basis profit/loss statements from which we could make an accurate comparison in establishing the loss due to disability.

In response, Mr. Vena advised us that it was something that could be done but would involve great effort and cost as they would need to have their IT department re-write the applicable programs. He informed us that this would be a tremendous project in terms of time and costs.

On September 20, 2007, we received accrual basis profit/loss statements for July and August 2007. We reviewed this information along with the previously provided information and conveyed our findings to Mr. Pekin in our letter of October 10, 2007. We have also provided Mr. Pekin with our calculations for his review. We understand that Mr. Pekin may not like the result of these findings; however, these calculations were made using the information provided to us.

You are correct that Mr. Pekin's policy does require that the same method of accounting must be used when determine his Loss of Earnings. However, Mr. Pekin has been providing us with accrual-based Profit/Loss statements as documentation of his monthly earnings. As this is the only information we are receiving, we are using it to calculate his monthly loss.

To ensure that benefits are paid appropriately, we also reconcile the financial information provided to us monthly against the annual tax returns for the same period. The annual tax returns provided have all been filed on a cash basis. The "Earnings Analysis" enclosed with our letter of October 10, 2007 compares his pre-disability average income to the current income using cash-basis information contained in the tax returns. The 2006 tax returns show that Mr. Pekin had a loss of $(1,360,975.00) for the year. Although there was a variance between what was reported to us monthly and the annual tax returns, he received and was eligible to receive full benefits throughout 2006.

Our need of cash-basis monthly profit/loss statements remains; however, we continue to receive profit/loss statements prepared on an accrual basis. If Mr. Pekin desires to provide us with cash basis profit/loss statements, we will be happy to review them to see if it results in a different amount of monthly earnings.

We would also like to remind you that this policy provides benefits for losses that are due solely to an injury or sickness. It is unclear at this time how much of the losses experienced by Mr. Pekin are due solely to his injury/sickness versus how much loss may be due to business trends.

We look forward to continue working with you and your client to ensure the he receives all benefits due according to the policy coverage he purchased.

Sincerely,


Scott Allen, ALHC
Senior Disability Benefit Specialist
The Paul Revere Life Insurance Company

E

# BARNES & THORNBURG LLP

Suite 4400
One North Wacker Drive
Chicago, IL 60606-2833 U.S.A.
(312) 357-1313
Fax (312) 759-5646

**William M. McErlean**
(312) 214-8820
william.mcerlean@btlaw.com

www.btlaw.com

October 29, 2007

<u>**VIA FEDERAL EXPRESS**</u>

Mr. Scott Allen
Senior Disability Benefit Specialist
The Paul Revere Life Insurance Company
18 Chestnut Street
Worcester, MA 01608-1528

Re:    Michael Pekin
       Claim No. 01-0263-4929-001

Dear Mr. Allen:

You and your company are playing a dangerous game of bad faith. Consider this letter and my prior letter to you as written proof of loss which you seem to require in your letter to me of October 19, 2007. Contrary to the assertions in your letter, Mr. Pekin only asked you to revise your decision based upon your disqualifying him for his benefits based on Oasis' decision to switch accounting method to accrual from cash, which you know produces phantom paper income, but no financial benefits to Mr. Pekin. You in your letter "appreciate this position", but claim it would be "inconsistent with how his Prior Earnings were determined", to not calculate business profit and losses. What is inconsistent is your using the accrual method of accounting because you admit that the policy requires that the same method of accounting must be used when determining Loss of Earnings.

What is disingenuous is to claim that since you are only receiving accrual profit loss statements your hands are tied and invite us to provide you with cash basis profit and loss statements. Mr. Pekin, at his expense, supplied to you on June 29, 2007, profit and loss statements done under the cash method of accounting for April and May of 2007 (attached hereto). You had those in your possession when you authored your letter of October 10th and 19th. We will supply you monthly profit and loss statements on a cash basis, which as you already know, will show actual losses and demonstrate that Mr. Pekin is entitled to have his coverage reinstated and paid as he suffered the requisite Loss of Earnings. Based on his submission of the cash basis profit and loss statements to you on June 29th, he is entitled to be paid his benefits for April and May and demand is hereby made for immediate payment.

The penultimate paragraph of your letter is cryptic. If you mean to suggest that Mr. Pekin's Loss of Earnings are attributable only to Oasis' actual losses, you are wrong. Even without those losses, Mr. Pekin's earnings, his salary and bonus are substantially less than his

Chicago      Elkhart      Fort Wayne      Grand Rapids      Indianapolis      South Bend      Washington, D.C.

Mr. Scott Allen
Senior Disability Benefit Specialist
The Paul Revere Life Insurance Company
October 29, 2007
Page 2

Past Earnings, which you benchmarked as $42,135.25 per month on October 3rd, because of Mr. Pekin's disability. Thus, without consideration of Oasis' actual losses Mr. Pekin is entitled to his monthly benefit.

This situation needs to be addressed and corrected immediately.

Sincerely yours,

BARNES & THORNBURG LLP

William M. McErlean

WMM/pab

cc:    Michael S. Pekin (via e-mail)

CHDS01 WMCERLEAN 426372v1

BARNES & THORNBURG LLP

F

# BARNES & THORNBURG LLP

Suite 4400
One North Wacker Drive
Chicago, IL 60606-2833 U.S.A.
(312) 357-1313
Fax (312) 759-5646

William M. McErlean
(312) 214-8820
william.mcerlean@btlaw.com

www.btlaw.com

November 20, 2007

**VIA FEDERAL EXPRESS**

Mr. Scott Allen
Senior Disability Benefit Specialist
The Paul Revere Life Insurance Company
18 Chestnut Street
Worcester, MA 01608-1528

     Re:   Michael Pekin
           Claim No. 01-0263-4929-001

Dear Mr. Allen:

    I am not sure what is the point of your letter of November 14, 2007, other than to demonstrate more bad faith. Mr. Pekin became eligible for disability benefits he purchased after a lengthy application process and investigation by UNUM, because Mr. Pekin's vision problems precluded him from continuing in his career as a trial lawyer. Since the time Mr. Pekin began receiving the benefits, absolutely nothing has changed. He is still disabled and he is still incurring a Loss of Earnings requiring the continued payment of the benefits he purchased.

    The only thing that has changed is that Mr. Pekin's employer this year decided to change from a cash basis financial reporting basis to an accrual basis. Mr. Pekin had no control over this decision and the accrual method produced phantom net income for his employer, not for Mr. Pekin or any other shareholder. UNUM seized on this change of accounting methodology to use this phantom income in its calculation of Loss of Earnings to wrongfully deprive him of his benefits. Let me make our position clear. Your claim that you can only use the financial reporting provided by Mr. Pekin's employer and use that to justify your denial of benefits is meritless. The policy contemplates including in a determination of Loss of Earnings any earnings that Mr. Pekin receives and pays taxes on from whatever source. It does not contemplate inclusion of phantom income generated by a change in an accounting method from which Mr. Pekin receives absolutely no benefit. In point of fact, it appears that you, on behalf of UNUM, were simply searching for a basis to justify denying Mr. Pekin his benefits. This is bad faith.

    I pointed out to you, and you conceded, that in determining Loss of Earnings UNUM was required to use the cash method of accounting in determining Mr. Pekin's benefits. Even though

Chicago       Elkhart       Fort Wayne       Grand Rapids       Indianapolis       South Bend       Washington, D.C.

Mr. Scott Allen
Senior Disability Benefit Specialist
The Paul Revere Life Insurance Company
November 20, 2007
Page 2

you know that the cash method of accounting for Oasis has historically produced huge book losses, you claimed that since Oasis changed accounting methods you can only use what you are provided forcing Mr. Pekin, at his expense, to provide you two months of restated profits and losses on a cash basis that demonstrates a fact you already knew – Oasis generates huge losses when reporting on a cash basis. This is bad faith.

Oasis' majority owner has decided to return to the cash method and restate its 2007 financials. We should have this restated reporting within 30 days and will supply it to you and we expect Mr. Pekin to have his benefits restored, including each month for 2007 that has been wrongfully withheld. That should be the end of this matter as UNUM will have no justification, pretextual or otherwise, for withholding Mr. Pekin's benefits.

But your letter of November 14, 2007 suggests that this will not be the end of this and that you, on behalf of UNUM, are on a bad faith fishing expedition trolling for excuses to deny Mr. Pekin his benefits. While you "strongly disagree" and are "personally offended" by these allegations of bad faith, you and UNUM should stop taking positions and writing letters that lend inescapably to that conclusion.

For example, in your November 14, 2007 letter you repeatedly insinuate that because UNUM unilaterally and without any basis decided that Mr. Pekin's disability began on March 10, 2004, and he was in his current position at Oasis at that time, UNUM is encountering "challenges" in determining how Mr. Pekin's loss of income is due to his medical condition as opposed to other factors such as his losses from his occupation as a trial attorney versus his losses as Executive Vice President of Oasis through Oasis' substantial losses through the years. By this I take it UNUM is searching for another alternative ground to try to deny Mr. Pekin the benefits to which he is entitled. This also is bad faith. Mr. Pekin's disability began when his vision problems began. He was advised that the vision problems would get better so he took a leave of absence from his position as a trial lawyer to give his problems time to get better. Of course, he did not think he was disabled at that time because he thought his problems would improve. They did not and by March of 2004, he realized that he never would be able to resume his career as a trial lawyer, which was more lucrative than his current career. Mr. Pekin bought disability insurance in the event he was disabled and could not continue his career as a trial attorney. That is what happened and this was all ground that was covered in 2004 when Mr. Pekin first made his claim for benefits. Your seeming attempt to revise the original decision and create possible "challenges" where none exist, as they did not in 2004 when the initial determination was made, is groundless.

Finally, why are you cryptically referring at the conclusion of your letter to Section 9.4 of the Policy? Are you expecting us to submit a written proof of loss and if so, why? Are you

BARNES & THORNBURG LLP

Mr. Scott Allen
Senior Disability Benefit Specialist
The Paul Revere Life Insurance Company
November 20, 2007
Page 3

going to claim that UNUM's wrongful denial of benefits the last several months is excused because a written proof of loss was not submitted within 90 days?

Sincerely yours,

BARNES & THORNBURG LLP

William M. McErlean

WMM/pab

cc:　　Michael S. Pekin (via e-mail)

CHDS01 WMCERLEAN 429693v1

BARNES & THORNBURG LLP

G



18 Chestnut Street
Worcester, MA
01608-1528
508 799 4441
www.unum.com

VIA FACSIMILE & US MAIL
November 29, 2007

William M. McErlean
Barnes & Thornburg, LLP
1 North Wacker Drive, Suite 4400
Chicago, IL 60606-2833

RE:      Michael Pekin
         Claim # 01-02634929-001

Dear Mr. McErlean:

We are writing concerning the above-referenced claim.

We have received your letter of November 20, 2007. We continue to disagree strongly with your assertions of bad faith. We do not believe that the facts of this claim support your accusations. We continue to welcome any information you or your client wish for us to consider in our evaluation of his claim for benefits under the terms and conditions of his policy.

We appreciate you raising the topic of the "phantom net income" and "huge book losses" generated by Oasis in your letter of November 20, 2007. This is one area of concern that is inhibiting our ability to determine how much of Mr. Pekin's losses, if any, are due solely to injury and/or sickness. While the inclusion of these losses benefited your client in the past, the cash-basis financial information provided for 2007 is conveying a different result.

You have indicated in your letter that additional information will be forthcoming in the form of additional cash basis profit/loss statements. It is our understanding that Mr. Pekin had previously provided us with cash-basis profit/loss statements for January through September 2007 with his fax of October 24, 2007; however, we remain available to consider any information you or your client may wish to provide in support of his claim.

Our reference to Section 9.4 of Mr. Pekin's policy is in regards to our previous request for additional information made of Mr. Pekin in our letter of May 17, 2007 – "explanation of $76,770.00 in other income subject to the self-employment tax listed on line 21 of the 2005 1040." We addressed this missing information in our letter of November 14, 2007 and provided you with the applicable policy provision. As of the date of today's letter, we have received no response to a written request for information made over six (6) month ago.

Finally, it has come to my attention that your firm used to be the exclusive defense firm for Paul Revere Life Insurance Company in the state of Indiana. According to our records, Barnes & Thornburg, LLC. represented Paul Revere from the mid 1990's until 2003. My employer is reserving all of its rights regarding a potential conflict of interest with Barnes & Thornburg, LLP.

If you have any questions, please feel free to contact me at 1-888-226-7959, extension 75046.

Sincerely,

Scott Allen, ALHC
Lead Disability Benefit Specialist
The Paul Revere Life Insurance Company

Unum is a registered trademark and marketing brand of Unum Group and its insuring subsidiaries.

H

# BARNES & THORNBURG LLP

Suite 4400
One North Wacker Drive
Chicago, IL 60606-2833 U.S.A.
(312) 357-1313
Fax (312) 759-5646

www.btlaw.com

William M. McErlean
(312) 214-8820
william.mcerlean@btlaw.com

January 22, 2008

VIA FEDERAL EXPRESS

Mr. Scott Allen
Senior Disability Benefit Specialist
The Paul Revere Life Insurance Company
18 Chestnut Street
Worcester, MA 01608-1528

      Re:   Michael Pekin
             Claim No. 01-0263-4929-001

Dear Mr. Allen:

      First, your letter of November 29, 2007, besides completely failing to address the substance of my letter of November 20, 2007 to you, also contains a glaring error. Mr. Pekin previously provided you with an oral explanation of the $76,770 on his 2005 Form 1040, a payment from his former law firm, which you apparently forgot. Mr. Pekin has subsequently informed you of this in writing.

      Second, this is my last attempt, prior to litigation, to demand that UNUM reverse course on its bad faith conduct quarterbacked by you over the course of the last year and reinstate Mr. Pekin's disability benefits and pay to him the benefits that have been wrongfully withheld last year. You might want to consult with your appropriate supervisory personnel before you make another decision in bad faith, or at least consult with those who will be responsible for defending the litigation that another bad faith decision will cause.

      Our position is very simple. Mr. Pekin qualified for and received the disability benefits he purchased because his eye problems precluded him from continuing in his career as a trial lawyer. Absolutely nothing has changed since UNUM made its initial decision in 2004 to provide coverage. Mr. Pekin is still disabled and he is still incurring a Loss of Earnings requiring the continued payment of the benefits he purchased. The only thing that changed since 2004 is that UNUM, through you, seized upon Mr. Pekin's employer's temporary decision to change accounting method from cash to accrual and used that change as a pretext to deny Mr. Pekin his benefits, even though Mr. Pekin had nothing to do with the change and the change produced no earnings or income or benefit of any kind to Mr. Pekin. As I told you in my letter of November 14th, the basis for this pretextual denial of benefits has been removed. Mr. Pekin's

Mr. Scott Allen
Senior Disability Benefit Specialist
The Paul Revere Life Insurance Company
January 22, 2008
Page 2

employer, again without any input from Mr. Pekin, has elected to stay on the cash method of accounting and has recast its 2007 results under that method. Enclosed is the Oasis Opco Consolidated Profit Loss for 2007, done under the cash method of accounting. Lou Vena, Controller of Oasis, is available to discuss the change in accounting methods.

Now, nothing at all has changed since UNUM first made the 2004 decision to pay Mr. Pekin his benefits. That was the right decision then and is the only right decision now.

Sincerely yours,

BARNES & THORNBURG LLP

William M. McErlean

WMM/pab

cc:    Michael S. Pekin (via e-mail)

CHDS01 WMCERLEAN 444659v1

BARNES & THORNBURG LLP



18 Chestnut Street
Worcester, MA
01608-1528
508 799 4441
www.unum.com

**VIA FACSIMILE & US MAIL**
January 31, 2008

William M. McErlean
Barnes & Thornburg, LLP
1 North Wacker Drive, Suite 4400
Chicago, IL 60606-2833

RE:      Michael Pekin
         Policy # 0102634929
         Claim # 01-02634929-001

Dear Mr. McErlean:

We are writing concerning the above-referenced claim under Paul Revere Life Insurance Company policy # 0102634929. We have concluded that your client does not qualify for any disability benefits under the terms and conditions of his policy. Our reasoning follows:

When we evaluate a claim for disability benefits, we compare the circumstances of a claim to the coverages provided by the policy to make a determination of liability. The disability coverage that Mr. Pekin purchased from Paul Revere Life Insurance Company insures him against loss of earned income due to an injury or sickness. We informed you in our letter of November 14, 2007 (copy enclosed) that based on the information provided in consideration of this claim; it was unclear to us how much of Mr. Pekin's financial losses, if any, were due to any injury or sickness Mr. Pekin may have.

Mr. Pekin's contract that is policy #0102634929 defines the following:

> **"Disability" or "Disabled"** refers to a continuing period of Total and/or Residual Disability.
>
> **"Total Disability"** means that because of Injury or Sickness:
>
> a. You are unable to perform the important duties of Your Occupation; and
>
> b. You are receiving Physician's Care. We will waive this requirement if We receive written proof acceptable to Us that further Physician's Care would be of no benefit to You.
>
> **"Residual Disability"** prior to the Commencement Date, means that due to Injury or Sickness which begins prior to age 65:
>
>> a. (1) You are unable to perform one or more of the important duties of Your Occupation; or
>> (2) You are unable to perform the important duties of Your Occupation for more than 80% of the time normally required to perform them; and
>>
>> b. You are receiving Physician's Care. We will waive this requirement if We receive written proof acceptable to Us that further Physician's Care would be of no benefit to You; and
>>
>> c. You are not Totally Disabled.

Unum is a registered trademark and marketing brand of Unum Group and its insuring subsidiaries.

As of the first Commencement Date to occur, Residual Disability means that due to the continuation of that Injury or Sickness:

    a.  You incur a Loss of Earnings while You are engaged in Your Occupation or another occupation; and

    b.  You are receiving Physician's Care.  We will waive this requirement if We receive written proof acceptable to Us that further Physician's Care would be of no benefit to You; and

    c.  You are not Totally Disabled.

**"Your Occupation"** means the occupation or occupations in which You are regularly engaged at the time Disability begins.

You have indicated in your letter dated January 22, 2008, that it is your position the Mr. Pekin has qualified for and received disability benefits because of eye problems precluding him from his career as a trial lawyer. We have therefore asked our clinical and vocational consultants to again review Mr. Pekin's file and offer their opinions of the information provided to date.

Our clinical consultant has reviewed Mr. Pekin's claim file and opined:

> *"The Attending Physician stated that the claimant would be limited in the amount of time he could read.  In my opinion, considering all of the medical opinions within this file, it would be reasonable to say that the claimant would be functionally limited to perform activities which require his eyes to be open for prolonged periods of time without the opportunity to blink, or rejuvenate themselves.  Prolonged or 'intense' reading (as stated by the AP) could be such an activity"*

Our vocational consultant also reviewed Mr. Pekin's claim file and opined:

> *"File information reflects that insured opted to voluntarily take a sabbatical from his former group and join Oasis Legal Finance.  Insured confirmed in his letter dating 7/28/04 that while he was experiencing significant problems with his eyes he did not feel that he was disabled at that time or unable to practice law as an attorney.*
>
> *"With respect to his current occupation, insured has confirmed that since joining Oasis the level of reading and intense concentration required was greatly reduced.  Insured continues to work full time.  Vocationally, it is my opinion that the restrictions and limitations noted would not impact insured's ability to perform the duties of 'Director of Underwriting & Business Development'."*

Our financial consultant has reviewed the cash-basis Profit/Loss statement submitted for Oasis Legal Finance Group & Oasis Legal Finance Operating Company and confirmed that Mr. Pekin did sustain earning losses in all months of 2007, except for February 2007.  Spreadsheets with our calculations are enclosed for your reference.

Mr. Pekin receives his earned income from Oasis Legal Finance in the form of both Guaranteed Payments and his share of any business profit or losses.  The financial information provided to us conveys that the amounts of Guaranteed Payments Mr. Pekin receives has increased annually. Additionally, the losses the business has sustained has increased as well (summarized in the chart below).

01/31/2008 THU 16:54  FAX 17744376561 UNUMPROVIDENT ORTHO UNIT                    ☒004/014

| | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|
| **Guaranteed Payments** | $104,348.00 | $178,006.00 | $216,325.00 | $249,996.00 |
| **Business Losses** | ($194,701.00) | ($257,691.00) | ($1,577,300.00) | ($241,519.00) |

Given that Mr. Pekin's restrictions and limitations would not affect his ability to perform the duties of his occupation at the time of claim (Director of Underwriting & Business Development), and a large part of his financial loss is due to increasing business losses; we find that Mr. Pekin's loss of earnings are not due to any injury or sickness he may have.

We therefore find that disability, as defined by Paul Revere Life Insurance policy # 0102634929, is not supported and no further benefits are due.

If you disagree with our determination and have any new information which you believe supports your client's eligibility for disability benefits, it must be sent to my attention for further review and consideration. We ask that you provide the information within 90 days of the date of this letter.

However, if you disagree with our determination and have no new information to submit for our consideration, you may directly appeal our decision. Your appeal must be in writing. We request that you submit your appeal as soon as possible, but no later than 180 days of the date of this letter. Your written appeal should include your specific comments and views of the basis of your disagreement. You should submit your written appeal to the following address:

> Worcester Benefits Center
> Appeals Unit
> P.O. Box 15112
> Worcester, MA 01615

Rule 9.19 of the Rules and Regulations of the Illinois Department of Insurance requires that our company advise you that if you wish to take this matter up with the Illinois Department of Insurance, it maintains a Consumer Division in Chicago at:

> 100 W. Randolph Street
> Suite 15-100
> Chicago, IL 60601

and in Springfield at:

> 320 W. Washington Street
> Springfield, IL 62767

Sincerely,

Scott Allen, ALHC
Lead Disability Benefit Specialist
The Paul Revere Life Insurance Company

Enclosures

- 3 -